UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

|  |  |
|---|---|
| BARBARA BATES, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| NORTHWESTERN HUMAN | ) |
| SERVICES, INC., et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |

Civil Action No. 04-2116 (RBW)

_____

**MEMORANDUM OPINION**

Barbara Bates and Bonnie Bell ("the plaintiffs"), on behalf of themselves and a putative

class of similarly situated individuals, bring this action against Northwestern Human Services,

Inc. ("NHS") and its two wholly-owned subsidiaries, Northwestern Human Services of Lehigh

Valley, Inc. ("NHSLV") and NHS MidAtlantic, Inc. ("NHSMA") (collectively "the defendants"),

asserting various statutory, regulatory, and common law violations in connection with the

defendants' alleged misappropriation and misuse of the plaintiffs' federal benefits payments and

other funds while acting as the plaintiffs' representative payee under the Social Security Act.

Complaint ("Compl.") ¶¶ 1-11.  Currently before the Court is the defendants' motion to dismiss

for failure to state a claim upon which relief may be granted ("Defs.' Mot.").[1]  For the reasons

_____

[1]  The following papers have been submitted to the Court in connection with these motions: (1) the
Defendants' Memorandum of Law in Support of their Motion to Dismiss Pursuant to Federal Rule of Civil
Procedure 12(b)(6) ("Defs.' Mem."); (2) the Plaintiffs' Memorandum of Points and Authorities in Opposition to
Defendants' Motion to Dismiss Plaintiffs' Complaint ("Pls.' Opp."); and (3) the Defendants' Reply Memorandum of
(continued...)

that follow, the Court grants in part and denies in part the defendants' motion to dismiss and

permits the plaintiffs to file an amended complaint in accordance with this Opinion.[2]

## I. Factual Background

The plaintiffs allege the following facts in support of their complaint.  Plaintiffs Bates

and Bell are "poor [and] unemployed" residents of the District of Columbia who are "disabled

due to mental illness" and who "rel[y] on government benefits payments, including monthly

payments by the federal Social Security Administration ["SSA"], to obtain basic living

necessities such as food, clothing and shelter."[3]  Compl. ¶¶ 6, 7.  The District of Columbia,

through its Department of Mental Health ("DMH"), is required by federal and District statutes

"to provide integrated, comprehensive, and coordinated mental health services to [District]

---

[1](...continued)
Law in Support of their Motion to Dismiss ("Defs.' Reply").

[2]  Also pending resolution is the plaintiffs' motion for class certification.  Because the Court is directing the plaintiffs, if they wish to do so, to file an amended complaint setting forth with greater particularity their RICO and Section 1983 claims against the defendants, it denies without prejudice the motion for class certification at this time. Once the Court has resolved the defendants' motion to dismiss the amended complaint, or once the defendants represent that they do not intend to move to dismiss the amended complaint, or at some other time as is appropriate, the plaintiffs may refile their motion for class certification.  Cf. Curtis v. Peters, 107 F. Supp. 2d 1, 10 (D.D.C. 2000) (holding that "[b]ecause the Court grants defendant's motion for summary judgment, it will deny plaintiffs' motion for class certification as moot, [as] [t]he other members of the [proposed] class should not be invited to board a sinking ship") (internal quotation marks and citation omitted).

[3]  The complaint often uses the term "the plaintiffs" indiscriminately and interchangeably to refer both to Barbara Bates and Bonnie Bell, who are the named plaintiffs in this case, and to the entire putative class of similarly situated individuals, sometimes doing so in successive sentences.  See Compl. ¶ 29 (alleging that "[m]any of the [p]laintiffs received several hundred dollars per month in benefits payments.  The [p]laintiffs and other class members had a federally protected right in their receipt of these benefits."); id. ¶ 30 (alleging that "[t]he [d]efendants were eventually approved by the SSA to act in [a] fiduciary capacity for Ms. Bates, Ms. Bell, and the other [p]laintiffs.  From that point forward, hundreds of thousands of dollars in federal or other benefits due to the [p]laintiffs were actually paid to the [d]efendants.").  The complaint's lack of clarity in this and other regards is in substantial tension, even considering the complex nature of the plaintiff's factual allegations, with the admonitions of Federal Rule of Civil Procedure 8 that a complaint "shall contain . . . a short and plain statement of the claim" being plead, Fed. R. Civ. P. 8(a), and that "[e]ach averment of a pleading shall be simple, concise, and direct," Fed. R. Civ. P. 8(e)(1).  In any event, to alleviate confusion and unless otherwise noted, at no point throughout this memorandum opinion should a quotation from the complaint referring to "the plaintiffs" be construed as encompassing any individuals other than plaintiffs Bates and Bell.

residents, including the homeless mentally ill." Id. ¶ 20; see id. ¶¶ 20-24 (describing the statutory

and regulatory scheme); see also 24 U.S.C. §§ 2255 et seq. (2000) (requiring provision of mental

health services); D.C. Code §§ 7-1131.01 et seq. and 44-901 et seq. (2005) (same); 22 DCMR §§

3402 et seq. (2006) (regulations implementing the statutory requirements).  This provision of

mental health services may be performed by the DMH directly or through certified service

providers acting as authorized agents of the District of Columbia.  Compl. ¶ 24; 22 DCMR §§

3402 et seq.  Defendant NHS and its two wholly owned subsidiaries, defendants NHSLV and

NHSMA, are Pennsylvania corporations which, with the authorization of the DMH, Compl. ¶ 27,

"[have] provided mental health and other services to [the] [p]laintiffs and others in the District of

Columbia."[4] Id. ¶¶ 8-10.  In furtherance of these duties, one or more of the defendants were

appointed by the SSA to act as a representative payee for certain District of Columbia residents,

including the plaintiffs, who were entitled to receive federal Social Security and Supplemental

Security Income ("SSI") payments pursuant to the Social Security Act, 42 U.S.C. §§ 405 and

1383 (2000).[5] Compl. ¶ 30.  The representative payee provisions of these two statutes state that

the Commissioner of Social Security may allow the payment of an individual's benefits to be

made to a duly certified fiduciary if the Commissioner "determines that the interest of [the]

individual . . . would be served thereby" and if the fiduciary, subject to a detailed oversight

---

[4]  The principal place of business of both NHS and NHSLV is Pennsylvania, Compl. ¶¶ 8-9, while the
principal place of business of NHSMA is the District of Columbia, id. ¶ 10.

[5]  It is unclear from the complaint exactly what role each defendant played in providing these services to the
plaintiffs, as the plaintiffs almost entirely fail to distinguish between the defendants when making their factual
allegations.  See, e.g., Compl. ¶ 27 (alleging that "[t]he District of Columbia authorized the [d]efendants to be
providers of mental health rehabilitative services"); id. ¶ 28 (alleging that the plaintiffs "received mental health
rehabilitative services . . . from the [d]efendants"); id. ¶ 29 (alleging that "[t]he [d]efendants soon determined that
providing mental health services to the [p]laintiffs on behalf of the District of Columbia enabled them to take control
of the [p]laintiffs' financial affairs"); id. ¶ 30 (alleging that "[t]he [d]efendants applied to the [SSA] to be appointed
as [the] [p]laintiffs' representative payee for benefits payments").

procedure, applies the benefit payments to the individual's "use and benefit."  42 U.S.C. § 405(j)(1)(a); see also 42 U.S.C. § 1383(a)(2)(A)(ii)(I) (stating that "[u]pon a determination by the Commissioner of Social Security that the interest of [an eligible] individual would be served thereby, such [benefit] payments shall be made . . . to [a representative payee] for the use and benefit of the individual"); 20 C.F.R. §§ 404.2001 et seq. and 416.601 et seq. (2006).  Applicants for appointment as representative payees must undergo an investigation by the SSA and must demonstrate "adequate evidence that such certification is in the interest of" the individual for whom representative payee status is sought.  42 U.S.C. §§ 405(j)(2)(A) and 1383(a)(2)(B)(ii); see also 20 C.F.R. §§ 404.2020 et seq. and 416.620 et seq.  The statutes state that "preference shall be given to" any applicant who is

> (I) a certified community-based nonprofit social service agency . . .,
>
> (II) a Federal, State, or local government agency whose mission is to carry out income maintenance, social service, or health care-related activities,
>
> (III) a State or local government agency with fiduciary responsibilities, or
>
> (IV) a designee of an agency (other than of a Federal agency) referred to in the preceding subclauses of this clause, if the Commissioner of Social Security deems it appropriate.

42 U.S.C. §§ 405(j)(2)(C)(v) and 1383(a)(2)(B)(vii); see also 20 C.F.R. §§ 404.2021 and 416.621.  Once appointed, representative payees are authorized to receive an individual's benefit payments and disburse monies to the individual for that individual's use and benefit.  42 U.S.C. §§ 405(j)(1)(A) and 1383(a)(2)(A)(ii)(I); see also 20 C.F.R. §§ 404.2035 and 416.635.  The payees are subject to "a system of accountability monitoring" under which they are forbidden from "misus[ing]" an individual's benefit payment in any way, 42 U.S.C. § 405(j)(1)(A); see also

4

42 U.S.C. § 1383(a)(2)(A)(iv) (stating that "misuse of benefits by a representative payee occurs in any case in which the representative payee receives payment under this subchapter for the use and benefit of another person and converts such payment . . . to a use other than for the use and benefit of [that] person"), and are required to report to the SSA at least once per year "with respect to the use of such payments," 42 U.S.C. §§ 405(j)(3)(A) and 1383(a)(2)(C)(i).[6] According to the plaintiffs, the defendants provided them with mental health services and served as their representative payee as of some unspecified date,[7] see Compl. ¶ 28 (alleging that the plaintiffs "received mental health rehabilitative services . . . from the [d]efendants"); id. ¶ 30 (alleging that "[t]he [d]efendants applied to the [SSA] to be appointed as [the] [p]laintiffs'

---

[6] The plaintiffs allege that "42 U.S.C. § 1383 require[s] the [d]efendants to establish a special account for each [p]laintiff's funds, and to use the money only for allowable expenses such as personal needs, medical treatment, therapy, or rehabilitation." Compl. ¶ 31. However, the plaintiffs have provided no specific authority for this assertion, and the only provision the Court can find in 42 U.S.C. § 1383 requiring the creation of a dedicated bank account limits the requirement to "representative payee[s] of an eligible individual under the age of 18." 42 U.S.C. § 1383(a)(2)(F)(I) (emphasis added).

[7] It appears evident—at least as far as the Court can discern, given the vague and repetitive generalities of the plaintiffs' allegations—that the District of Columbia authorized defendants NHS, NHSLV, and NHSMA to provide such services in 1996, 1999, and 2002, respectively. See Compl. ¶ 54 (alleging that "the [d]efendants' scheme began upon their authorization by the District of Columbia to be a provider of mental health services on behalf of the District, which for NHS was in or about 1996"); id. ¶ 64 (alleging that "the [d]efendants' scheme began upon their authorization by the District of Columbia to be a provider of mental health services on behalf of the District, which for NHSLV was in or about 1999"); id. ¶ 74 (alleging that "the [d]efendants' scheme began upon their authorization by the District of Columbia to be a provider of mental health services on behalf of the District, which for [NHSMA] was in or about 2002"). However, in addition to its repeated failure to clearly distinguish between the defendants, see note 5, supra, there is no indication in the complaint of the date or dates on which the defendants began providing mental health services (and were appointed as representative payees) to the plaintiffs specifically, as opposed to the dates on which the defendants were generally authorized to serve as mental health service providers in the District. See Compl. ¶ 30 (alleging that "[t]he [d]efendants were eventually approved by the SSA to act [as representative payees] for Ms. Bates [and] Ms. Bell"); id. ¶ 33 (alleging generally that the defendants violated the law "[f]rom the time that [they] were first appointed as representative payee[s] to the present day"). In addition, because the plaintiffs persistently refer to the defendants as being the plaintiffs' "representative payee" rather than their "representative payees," the Court presumes, in the absence of other evidence, that the defendants served collectively as the plaintiffs' representative payee, as opposed to one or more of the defendants serving individually or at separate times in this capacity. See,e.g., id. ¶ 30 (alleging that "[t]he [d]efendants applied to the [SSA] to be appointed as [the] [p]laintiffs' representative payee for benefits payments"); see also Part III.A.2 (discussing the failure of the complaint to distinguish between the actions of the defendants for the purposes of the "distinctiveness requirement" of 18 U.S.C. § 1962(c) (2000)).

representative payee for benefits payments . . . [and] were eventually approved"), until some date

no later than June 2004, see id. ¶ 34 (alleging that the defendants "stopped providing mental

health services in the District of Columbia"); id. ¶ 47 (alleging that "on June 30, 2004, the

[d]efendants closed the [NHSMA] office" in the District of Columbia").   The plaintiffs allege

that the defendants, in their capacity as the plaintiffs' representative payee, "misused and/or

misappropriated a substantial amount of [the plaintiffs' federal benefits payments] for their own

purposes," id. ¶ 2; see also id. ¶ 33 (alleging that the defendants "misappropriated and misused

the federal payments and other funds that they received as [the] [p]laintiffs' representative

payees, and thereby deprived the [p]laintiffs of the benefits to which they were entitled"), and

subsequently "left the jurisdiction[] without ever properly accounting for or returning the

[p]laintiffs' misspent and unaccounted for funds," id. ¶ 2; see also id. ¶ 34 (alleging that the

defendants "left the jurisdiction without returning all of the [p]laintiffs' funds in the

[d]efendants' possession").   The plaintiffs further allege that the defendants, contrary to federal

law, "failed to implement policies or procedures to enable them to account properly for [the]

[p]laintiffs' funds."   Id. ¶ 35.

The plaintiffs brought this action on December 6, 2004, asserting a panoply of statutory,

regulatory, and common law claims against all three defendants.   Id. ¶¶ 48-124.  First, the

plaintiffs allege that the defendants violated Sections 1962(c) and (d) of the Racketeer Influenced

and Corrupt Organizations Act, 18 U.S.C. § 1962 (2000) ("RICO"), by "participat[ing and

conspiring] in the conduct of an enterprise's affairs through a pattern of racketeering

activity"—specifically, repeated acts of mail and wire fraud—in order to misappropriate the

plaintiffs' federal benefits payments.  Compl. ¶¶ 52, 62, 72; 18 U.S.C. § 1962(c) ("Section

1962(c)"); see generally Compl. ¶¶ 48-83.  Second, the plaintiffs allege that the defendants

violated 42 U.S.C. § 1983 (2000) ("Section 1983") by acting under color of state law to deprive

them of a federally protected right to receive their benefits payments.  Compl. ¶¶ 84-90.  Third,

the plaintiffs allege that the defendants violated 42 U.S.C. §§ 405 and 1383, as well as their

associated regulations, by failing to comply with the requirements of the relevant representative

payee provisions.  Compl. ¶¶ 91-104.  Finally, the plaintiffs assert claims of breach of fiduciary

duty, negligence, conversion, and "money had and received" in connection with the allegedly

misused and misappropriated funds.  Id. ¶¶ 110-124.  The plaintiffs seek an accounting of all

funds received, spent, and possessed by the defendants in their capacity as the plaintiffs'

representative payee, as well as "a court determination of all unlawful and unauthorized

expenditures" of those funds.  Id. at 30; see also id. ¶¶ 105-109.  The plaintiffs also seek, inter

alia, compensatory, consequential, and punitive damages.  Id. at 30.

On January 25, 2005, the defendants moved to dismiss all but three counts of the

plaintiffs' complaint for failure to state a claim upon which relief can be granted.[8]  Specifically,

the defendants argue that (1) the plaintiffs' civil RICO claims fail to allege the existence of an

"enterprise" separate and distinct from the defendants themselves, as required by 18 U.S.C. §

1962(c), Defs.' Mem. at 4-9; (2) the plaintiffs' allegations of mail and wire fraud in connection

with their civil RICO claims are not set forth with sufficient particularity to satisfy the

heightened pleading requirement of Federal Rule of Civil Procedure 9(b), id. at 9-13; (3) the

plaintiffs' Section 1983 claims fail because the defendants were not acting under color of state

---

[8]  The defendants did not move to dismiss the plaintiffs' claims for breach of fiduciary duty, negligence, and conversion.  See Defs.' Mot. at 1.

law, id. at 20-26; (4) the plaintiffs' claims under 42 U.S.C. §§ 405, 1383, and 1983 fail because

the plaintiffs do not possess a relevant and enforceable private right of action, id. at 13-17, 26-27;

(5) the plaintiffs' claims under 42 U.S.C. §§ 405 and 1383 also fail because Congress did not

intend to create a private remedy to enforce those statutes and their implementing regulations, id.

at 17-20; (6) the plaintiffs fail to allege the elements necessary to establish a claim for money had

and received, id. at 29-30; (7) the plaintiffs' claims for money had and received and for an

equitable accounting should be dismissed because the plaintiffs have an adequate remedy at law,

id. at 28-29; and (8) the plaintiffs fail to allege facts sufficient to support their request for

punitive damages, id. at 27-28.  The plaintiffs challenge all of these arguments.  See generally

Pls.' Opp.

## II. Standard of Review

When evaluating a motion to dismiss for failure to state a claim upon which relief can be

granted pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court "must treat the

complaint's factual allegations as true and must grant [the] plaintiff[s] the benefit of all

reasonable inferences [that can be derived] from the facts alleged."  Trudeau v. FTC, 456 F.3d

178, 193 (D.C. Cir. 2006) (internal quotation marks and citations omitted).  However, the Court

need not accept inferences that are unsupported by the facts set forth in the complaint or "legal

conclusion[s] couched as . . . factual allegation[s]."  Id. (internal quotation marks and citations

omitted); see also M.K. v. Tenet, 99 F. Supp. 2d 12, 17 (D.D.C. 2000) (stating that "[b]are

conclusions of law and sweeping and unwarranted averments of fact will not be deemed

admitted" for the purposes of a Rule 12(b)(6) motion) (citing Haynesworth v. Miller, 820 F.2d

1245, 1254 (D.C. Cir. 1987)).  The Court may only consider the facts alleged in the complaint,

any documents attached as exhibits, and matters about which the Court may take judicial notice

in addressing a Rule 12(b)(6) motion.  EEOC v. St. Francis Xavier Parochial Sch., 117 F.3d 621,

624-25 (D.C. Cir. 1997).  A complaint may be dismissed under Rule 12(b)(6) "only if it is clear

that no relief could be granted under any set of facts that could be proved consistent with the

allegations."  Swierkiewicz v. Sorema, 534 U.S. 506, 514 (2002).  Finally, "a complaint that

omits certain essential facts and thus fails to state a claim warrants dismissal under Rule

12(b)(6)[,] but not dismissal with prejudice."  Belizan v. Hershon, 434 F.3d 579, 583 (D.C. Cir.

2006).

### III. Analysis

*A. The Plaintiffs' Civil RICO Claim*

The defendants argue that the plaintiffs do not allege the existence of a RICO "enterprise"

separate and distinct from any of the defendants—NHS, NHSLV, or NHSMA—as required by 18

U.S.C. § 1962(c).  Defs.' Mem. at 4-9; Defs.' Reply at 3-11.  The defendants further contend that

the plaintiffs fail to plead the existence of the alleged predicate acts of mail and wire fraud with

sufficient specificity to satisfy the heightened pleading requirement of Rule 9(b).  Defs.' Mem. at

9-13; Defs.' Reply at 11-14; see Fed. R. Civ. P. 9(b) (stating that "[i]n all averments of fraud . . .

the circumstances constituting fraud . . . shall be stated with particularity").  For the reasons

discussed below, the Court concludes that the facts alleged by the plaintiffs do not necessarily

preclude the existence of a separate and distinct enterprise involving a parent corporation and its

wholly-owned subsidiaries sufficient to meet the requirements of Section 1962(c).  The Court

finds, however, that it is unable to make a conclusive determination on the strength of the facts

alleged in the plaintiffs' complaint regarding the distinctiveness of the defendants from each

other and from the alleged RICO enterprise in carrying out the purportedly criminal activities.

The Court also agrees with the defendants that the plaintiffs' complaint does not provide enough

detail regarding the alleged acts of mail and wire fraud and their relationship to the conduct being

challenged by the plaintiffs to satisfy Rule 9(b)'s heightened pleading requirement.  Accordingly,

the Court must dismiss the plaintiffs' RICO claims.  However, because it is appropriate to

dismiss these claims without prejudice, see Belizan, 434 F.3d at 583, the Court will grant the

plaintiffs leave to amend their complaint to plead these allegations with greater particularity.

### 1. RICO and the Plaintiffs' Allegations

Section 1962(c) of RICO states, in relevant part, that "[i]t shall be unlawful for any

person employed by or associated with any enterprise engaged in, or the activities of which

affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the

conduct of such enterprise's affairs through a pattern of racketeering activity."[9]  18 U.S.C. §

1962(c).  Thus, to survive a Rule 12(b)(6) motion to dismiss, plaintiffs bringing a Section

1962(c) claim must allege that (1) a person or persons (2) associated with an enterprise (3)

conducted (4) the affairs of that enterprise (4) through a pattern (5) of racketeering activity.  See

Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 (1985) (delineating the elements of a Section

1962(c) claim).  Among the predicate acts constituting "racketeering activity" under Section

1962(c) are mail fraud and wire fraud.  18 U.S.C. § 1961(1) (2000); see also 18 U.S.C. §§ 1341

and 1343 (2000) (stating the elements of mail and wire fraud).  The RICO statute further defines

"person" as "any individual or entity capable of holding a legal or beneficial interest in property,"

---

[9]  The defendants do not claim that the enterprises alleged by the plaintiffs are not "engaged in," or do not affect, "interstate or foreign commerce."  18 U.S.C. § 1962(c); see generally Defs.' Mem. at 4-9; Defs.' Reply at 3-11.

18 U.S.C. § 1961(3), and "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity," 18 U.S.C. § 1961(4).

Congress enacted Section 1962(c), and RICO generally, "to target . . . the exploitation and appropriation of legitimate business by corrupt individuals." Yellow Bus Lines, Inc. v. Drivers, Chauffeurs & Helpers Local Union 639, 883 F.2d 132, 139 (D.C. Cir. 1989), modified on other grounds, 913 F.2d 948 (D.C. Cir. 1990), cert. denied, 501 U.S. 1222 (1991) (citation omitted); see also Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 165 (2001) (noting that the legislative history of Section 1962(c) "refers frequently to the importance of undermining organized crime's influence upon legitimate businesses . . . [as well as] the need to protect the public from those who would run organizations in a manner detrimental to the public interest") (internal quotation marks and citation omitted).  A RICO enterprise may therefore be either a "victim" or a "tool" of the persons who conduct its affairs to achieve criminal objectives, Kushner, 533 U.S. at 162, for "RICO both protects a legitimate 'enterprise' from those who would use unlawful acts to victimize it, and . . . protects the public from those who would unlawfully use an 'enterprise' (whether legitimate or illegitimate) as a 'vehicle' through which 'unlawful activity is committed,'" id. at 164 (internal citations omitted).  Regardless of its nature, however, such an enterprise must be "proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates [comprising the enterprise] function as a continuing unit." United States v. Turkette, 452 U.S. 576, 583 (1981); see also United States v. Johnson, 440 F.3d 832, 840 (6th Cir. 2006) (observing that "[a] RICO enterprise is an ongoing structure of persons associated through time, joined in purpose, and organized in a manner

11

amenable to hierarchical or consensual decision-making") (internal quotation marks, citation, and emphases omitted).  The enterprise must also be legally distinct from the RICO person or persons who are alleged to be engaging in a pattern of racketeering activity through the enterprise's affairs.  Kushner, 533 U.S. at 161; see also Yellow Bus Lines, 883 F.2d at 139 (stating that "[l]ogic alone dictates that one entity may not serve as the enterprise and the person associated with it") (citation omitted); Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A., 30 F.3d 339, 344 (2d Cir. 1994) (observing that the distinctiveness requirement of Section 1962(c) "focuses the section on the culpable party and recognizes that the enterprise itself is often a passive instrument or victim of the racketeering activity") (internal quotation marks and citations omitted).  Finally, "[a]ny person injured in his business or property" by a violation of Section 1962(c) may bring a civil action against the alleged violators.  18 U.S.C. § 1964(c).  If successful, a Section 1962(c) plaintiff shall be awarded, inter alia, treble the damages caused by the racketeering activity.  Id.

Here, the plaintiffs attempt to satisfy the "enterprise" requirement of Section 1962(c) by covering all possible bases, alleging that (1) NHS acted as a RICO person through a RICO enterprise "consisting of at least (i) NHS, NHSLV and/or [NHSMA], individually and/or as an association in fact, and/or (ii) NHS, NHSLV, [NHSMA] and the District of Columbia . . ., individually and/or as an association in fact," Compl. ¶ 50; (2) NHSLV acted as a RICO person through a RICO enterprise "consisting of at least (i) NHS and/or [NHSMA], individually and/or as an association in fact, and/or (ii) NHS, NHSLV, [NHSMA] and the District of Columbia . . ., individually and/or as an association in fact," id. ¶ 60; and (3) NHSMA acted as a RICO person through a RICO enterprise "consisting of at least (i) NHS and/or NHSLV, individually and/or as

an association in fact, and/or (ii) NHS, NHSLV, [NHSMA] and the District of Columbia . . ., individually and/or as an association in fact," id. ¶ 70.[10]  The plaintiffs also bring an action under 18 U.S.C. § 1962(d), alleging that all three defendants "conspired to violate [Section 1962(c)] to the [p]laintiffs' detriment."  Compl. ¶ 81; see also 18 U.S.C. § 1962(d) (stating that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section").

As for the predicate acts of mail and wire fraud, the plaintiffs allege that "[t]he [d]efendants repeatedly used or caused others to use the United States mails and interstate wires to further their scheme to misappropriate the [p]laintiffs' funds."  Compl. ¶ 39.  Specifically, the plaintiffs contend that the defendants committed mail and wire fraud when they (1) maintained bank accounts in the plaintiffs' names and "fraudulently misrepresented to the banks that they were holding and properly managing the [p]laintiffs' funds in these accounts in a fiduciary capacity as the [p]laintiffs' representative payee," id. ¶ 40; (2) "caused banks . . . to use the United States mails to send" a monthly bank statement to them containing information relating to the plaintiffs' accounts and then "used these monthly statements to monitor their unlawful activity," id. ¶ 41; (3) "regularly used the mails and interstate wires to have money transferred" between the plaintiffs' business and personal accounts, id. ¶ 42; (4) "using the interstate wires, caused the federal government, the District of Columbia government, and other persons to deposit federal benefits payments and other monies" into the plaintiffs' bank accounts on a

---

[10]  Because the Court is directing the plaintiffs to amend their complaint to set out with greater specificity the role of each defendant in the alleged RICO enterprise or enterprises, see infra, it need not address at this time the merits of the plaintiffs' alternative allegation that the District of Columbia government constituted a RICO enterprise through which the defendants, individually or collectively, conducted their putative racketeering activity.  See Compl. ¶¶ 50, 60, 70; Defs.' Mem. at 8 n.1; Pls.' Opp. at 9-10; Defs.' Reply at 9-11.

monthly basis, and then "used these wired deposits to obtain possession of and then to misappropriate the [p]laintiffs' funds," id. ¶ 43; and (5) "using the United States mails, . . . caused the federal government, the District of Columbia government, and other persons to send the [p]laintiffs' monthly federal benefits and other payments" to the defendants' offices on a monthly basis, id. ¶ 44.   Finally, the plaintiffs assert, somewhat cryptically, that "[t]he [d]efendants' mail and wire fraud was composed of discrete acts having the same or similar purposes, results, participants, victims or methods of operation, or otherwise were interrelated by distinguishing characteristics and are not isolated events." Id. ¶¶ 53, 63, 73.

　　　*2. Section 1962(c)'s Distinctiveness Requirement*

　　　The District of Columbia Circuit, along with eleven other Circuits, has conclusively held that "the same entity cannot be [named as] the RICO enterprise and [as] a RICO defendant." Confederate Mem'l Ass'n v. Hines, 995 F.2d 295, 300 (D.C. Cir. 1993) (citation omitted); see Yellow Bus Lines, 883 F.2d at 139 (concluding that the designation of one entity "as both the 'enterprise' and the defendant 'person' does not comport with statutory language or design"); see also Kushner, 533 U.S. at 162 (noting that "12 Courts of Appeals have interpreted [Section 1962(c)] as embodying some . . . distinctness requirement") (citing cases).   Moreover, in 2001, the Supreme Court agreed with the "basic principle" of the Section 1962(c) distinctiveness requirement, observing that "to establish liability under [Section 1962(c)] one must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." Kushner, 533 U.S. at 161 (emphasis added).

In deciding the defendants' motion to dismiss the plaintiffs' RICO claims, the initial inquiry is therefore whether the defendants—as a parent corporation and its two wholly owned subsidiaries—constitute "the same entity" for the purposes of Section 1962(c).  Hines, 995 F.2d at 300; see Defs.' Mem. at 6 (arguing that "NHS and its subsidiaries, NHSLV and [NHSMA], constitute one, unitary economic entity").  This question has never been resolved by the District of Columbia Circuit, and other Circuits reached conflicting results prior to Kushner.  See Bessette v. Avco Fin. Servs., Inc., 230 F.3d 439, 449 (1st Cir. 2000) (examining "the allegations in the complaint to determine whether the parent's activities are sufficiently distinct from those of the subsidiary at the time that the alleged RICO violations occurred") (citation omitted); Fogie v. THORN Americas, Inc., 190 F.3d 889, 897 (8th Cir. 1999) (concluding that "to impose liability on a subsidiary for conducting an enterprise comprised solely of the parent of the subsidiary and related businesses would be to misread [Section 1962(c)]"); Brannon v. Boatmen's First Nat'l Bank of Okla., 153 F.3d 1144, 1147 (10th Cir. 1998) (concluding that "in order to state a viable claim under [Section 1962(c)] against a [subsidiary] for conducting the affairs of its parent corporation, a plaintiff must, at the very least, allege the parent somehow made it easier to commit or conceal the fraud of which the plaintiff complains") (internal quotation marks and citation omitted); Discon, Inc. v. NYNEX Corp., 93 F.3d 1055 (2d Cir. 1996), vacated on other grounds, 525 U.S. 128 (1998) (finding that parent corporation and its subsidiaries were not sufficiently distinct for RICO purposes); Jaguar Cars, Inc. v. Royal Oaks Motor Co., 46 F.3d 258, 268 (3d Cir. 1995) (holding that a corporation properly serves as a RICO enterprise where it is a "legally distinct" entity from the persons named as RICO defendants); NCNB Nat'l Bank of N.C. v. Tiller, 814 F.2d 931, 936 (4th Cir. 1987), overruled on

15

other grounds by Busby v. Crown Supply, Inc., 896 F.2d 833, 841 & n.8 (4th Cir. 1990) (holding

that "a 'person' is not distinct from an 'enterprise' when a corporation and its wholly owned

subsidiary are involved"); Haroco, Inc. v. Am. Nat'l Bank and Trust Co. of Chi., 747 F.2d 384,

402 (7th Cir. 1984), modified by Sedima, 473 U.S. at 500 n* (holding that Section 1962(c)

"requires only some separate and distinct existence for the person and the enterprise," and

finding that "a subsidiary corporation is certainly a legal entity distinct from its parent").

     The plaintiffs contend that whatever confusion may have existed regarding the

relationship between parent corporations and their subsidiaries in the RICO context has

dissipated following Kushner, which held that the president and sole shareholder of a corporation

was a separate and distinct entity from the corporation itself, such that the president was a

"person" and the corporation an "enterprise" for the purposes of Section 1962(c).  Pls.' Opp. at 5;

Kushner, 533 U.S. at 163.  The Kushner Court concluded that because the president and sole

shareholder was "a legally different entity with different rights and responsibilities" than the

corporation itself, Section 1962(c)'s distinctiveness requirement was satisfied.  Kushner, 533

U.S. at 163; see also id. at 166 (stating that "the need for two distinct entities is satisfied" where

the corporation and its sole shareholder "are not legally identical").  The plaintiffs thus argue that

this Court is compelled by Kushner to find that a parent corporation and its subsidiary, like a

corporation and its sole shareholder, may be named as a RICO person and a RICO enterprise

without violating the distinctiveness requirement of Section 1962(c).  Pls.' Opp. at 6-7.

     The defendants counter by asserting that "Kushner stands only for the limited proposition

that the sole shareholder/employee (a natural person) is distinct from his corporation for RICO

purposes."  Defs.' Reply at 3.  They claim that because "[the] plaintiffs' complaint alleges neither

an employer/employee relationship[] nor a relationship between a natural person and a corporation," Kushner is wholly inapposite to the facts presented in this case.  Id.  Rather, the defendants point to Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752 (1984), which held that a parent corporation and its subsidiary could not form an enterprise in the Sherman Act context, see 15 U.S.C. § 1 (2000), and to various pre-Kushner decisions in other Circuits concluding that the parent-subsidiary relationship is not sufficiently distinct under Section 1962(c).  Defs.' Reply at 4-6 (primarily discussing Copperweld, Discon, and Fogie).

The defendants are correct that Kushner's reach is not quite as broad as the plaintiffs claim.  Indeed, the Supreme Court took care to craft its holding narrowly, restricting its application of the distinctiveness requirement to "circumstances in which a corporate employee, acting within the scope of his authority, allegedly conducts the corporation's affairs in a RICO-forbidden way."  Kushner, 533 U.S. at 163 (internal quotation marks and citation omitted).  Moreover, the Court expressly stated that prior Second Circuit precedent—including Discon, which explicitly held that a parent corporation and its subsidiaries could not together form a RICO enterprise—"involved quite different circumstances which [were] not presented [by the facts of Kushner]."  Id. at 164 (citing Discon, among other cases); see also id. (observing that Discon and other Second Circuit precedent "involved significantly different allegations compared with the instant case") (citations omitted).[11]  Nevertheless, the fundamental principle articulated in Kushner—that so long as two entities "are not legally identical," they are sufficiently distinct for one to be named as a RICO person and the other as a RICO enterprise—is certainly

---

[11] Kushner was before the Supreme Court on the grant of a writ of certiorari from a ruling issued by the United States Court of Appeals for the Second Circuit.  Kushner, 533 U.S. at 158.

applicable to the facts at hand, and does not substantially remap the boundaries of the

distinctiveness requirement set forth in this Circuit by <u>Yellow Bus Lines</u> and <u>Hines</u>.[12]   <u>Id.</u> at 166.

Instead, <u>Kushner</u> merely states, without qualification, that Section 1962(c)'s distinctiveness

requirement is satisfied when the alleged RICO person and the alleged RICO enterprise are

"legally different entit[ies] with different rights and responsibilities due to [their] different legal

status." <u>Id.</u> at 163.   This conclusion applies equally well whether or not the RICO defendant

alleged to be "employed by or associated with" the RICO enterprise is a natural person or a

fictive legal entity such as a corporation.   18 U.S.C. § 1962(c); <u>see also</u> 18 U.S.C. § 1961(3)

(defining "person" for RICO purposes as "any individual or entity capable of holding a legal or

beneficial interest in property").   <u>Kushner</u> itself states that an "incorporation's basic purpose is to

create a distinct legal entity."   <u>Kushner</u>, 533 U.S. at 163.   It is nonsensical to suppose that a

parent corporation and its wholly owned subsidiary, each duly and separately incorporated,[13] may

---

[12]   The language of <u>Yellow Bus Lines</u> may be read to obliquely suggest that a parent corporation and its subsidiaries are <u>not</u> sufficiently distinct to satisfy Section 1962(c), stating as it does that "allowing plaintiffs to generate . . . 'contrived partnerships' consisting of an umbrella organization and its subsidiary parts would render the [distinctiveness] requirement of [S]ection 1962(c) meaningless."  883 F.2d at 141.  To the extent that this is in tension with <u>Kushner</u>'s statement that "the need for two distinct entities is satisfied" where the corporation and its sole shareholder "are not legally identical," the Supreme Court's holding in <u>Kushner</u> clearly controls.  <u>Kushner</u>, 533 U.S. at 166.  As an illustrative example, the Eighth Circuit stated prior to <u>Kushner</u> that "there must be a greater showing that the parent and subsidiary are distinct [under Section 1962(c)] than the mere fact that they are separate legal entities."  <u>Fogie</u>, 190 F.3d at 898; <u>see also</u> <u>Compagnie De Reassurance D'ile De France v. New England Reinsurance Co.</u>, 57 F.3d 56, 92 (1st Cir. 1995) (holding that "[t]he [legal] distinction between . . . three [corporate] entities is not . . . decisive for [Section 1962(c)] purposes").  Courts interpreting <u>Fogie</u> after <u>Kushner</u>, however, must reconcile that statement with <u>Kushner</u>'s apparently contradictory conclusion that entities <u>are</u> distinct under Section 1962(c) simply because they are "legally different . . . with different rights and responsibilities."  <u>Kushner</u>, 533 U.S. at 163.

[13]   Although the plaintiffs contend in their opposition to the defendants' motion to dismiss that each defendant was incorporated "at different times and for different reasons," Pls.' Opp. at 4, the complaint does not specifically allege these facts and thus the Court cannot take them as true.  <u>St. Francis Xavier Parochial Sch.</u>, 117 F.3d at 624-65 (observing that "[i]n determining whether a complaint fails to state a claim [upon which relief can be granted], [a court] may consider only the facts alleged in the complaint, any documents attached to . . . the complaint, and matters of which [a court] may take judicial notice") (citations omitted); <u>see</u> Compl. ¶¶ 8-10 (alleging only that each defendant "is a non-profit corporation formed under the laws of the State of Pennsylvania").  Nevertheless,

(continued...)

be considered distinct legal entities from one another in the ordinary course of events, but <u>not</u>, as a categorical matter, in the context of Section 1962(c), despite the Supreme Court's clear statement that it is the "different legal status" of a sole shareholder and his closely held corporation that properly distinguishes a RICO person from a RICO enterprise.  <u>Kushner</u>, 533 U.S. at 162.  Corporations may be RICO persons under 18 U.S.C. § 1961(3), and they may also be RICO enterprises under 18 U.S.C. § 1961(4).  <u>See</u> 18 U.S.C. §§ 1961(3) (defining "person"), (4) (defining "enterprise").  <u>Kushner</u> thus stands most reasonably for the proposition that as long as the <u>same</u> corporation is not playing both the role of a person and an enterprise in a plaintiff's RICO claim, the distinctiveness requirement of Section 1962(c) is presumptively satisfied.  <u>See</u> <u>Kushner</u>, 533 U.S. at 161 (stating that a Section 1962(c) plaintiff "must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name").  While <u>Kushner</u> does not expressly sanction the naming of a parent corporation and its wholly owned subsidiary as a distinct RICO person and RICO enterprise, its language must be fairly said to leave the door open to such a result.[14]

    This is not to say, however, that the plaintiffs <u>in this case</u> have necessarily alleged facts sufficient to allow this Court to determine that any of the various combinations of RICO persons

---

[13](...continued)
neither party disputes that NHS is the parent corporation of NHSLV and NHSMA, which are its wholly-owned subsidiaries.

    [14] For this reason, <u>Copperweld</u>, which held that "[a] parent and its wholly owned subsidiary have a complete unity of interest" which renders them "a single enterprise" incapable of conspiring together for the purposes of the Sherman Act, 15 U.S.C. § 1, is easily distinguished from the thrust of the <u>Kushner</u> holding.  467 U.S. at 771.  As the <u>Kushner</u> Court noted, the holding in <u>Copperweld</u> "turn[ed] on specific antitrust objectives" that are not present in the RICO context.  <u>Kushner</u>, 533 U.S. at 166.  Similarly, the Seventh Circuit in <u>Haroco</u> found that the rationale underlying the holding in <u>Copperweld</u> "does not extend to [Section 1962(c)] primarily because the Sherman Act is premised, as RICO is not, on the 'basic distinction between concerted and independent action.'"  <u>Haroco</u>, 747 F.2d at 403 n.22 (quoting <u>Copperweld</u>, 467 U.S. at 767).

and RICO enterprises pled in the complaint are truly distinct under Section 1962(d).  Thus,

having concluded that a parent corporation and its subsidiary may satisfy Section 1962(d)'s

distinctiveness requirement, the Court must now consider whether defendants NHS, NHSLV,

and NHSMA are properly considered distinct legal entities in the context of the plaintiffs' RICO

allegations.

It is true that "[n]otwithstanding the fact that [parent and subsidiary corporations] may be

extremely interrelated, each is [ordinarily] deemed to have an independent existence."  Diamond

Chem. Co. v. Atofina Chems., Inc., 268 F. Supp. 2d 1, 18 (D.D.C. 2003); see Fogie, 190 F.3d at

898 (observing that "[a] parent corporation and a subsidiary are separate legal entities"); Haroco,

747 F.2d at 402 (finding that "a subsidiary corporation is certainly a legal entity distinct from its

parent").  However, a parent corporation and its subsidiaries are not always considered distinct

legal entities for the purposes of attaching civil and criminal liability.  See Diamond Chem. Co.,

268 F. Supp. 2d at 13-14 (reciting the "four different tests [that courts have applied] to determine

whether a parent corporation is liable for the acts of its subsidiary") (internal quotation marks and

citation omitted); cf. Copperweld, 467 U.S. at 771-72 (describing the ways in which the actions

of a parent corporation and its wholly-owned subsidiary are "guided or determined not by two

separate corporate consciousnesses, but one").  If the actions or intertanglement of NHS and its

subsidiaries, NHSLV and NHSMA, are so indistinguishable in the context of what allegedly

occurred in this case as to make the parent corporation liable for criminal activities attributed to

its wholly owned subsidiaries under the applicable tests, then it would be inconsistent to treat

NHS, NHSLV, and NHSMA as different entities under Section 1962(c).  While it is true that

RICO is not premised "on the basic distinction between concerted and independent action,"

20

Haroco, 747 F.2d at 403 n.22 (internal quotation marks and citation omitted), NHS and its

subsidiaries are surely not distinct if one is merely acting as a stand-in for the other two when

carrying out the pattern of racketeering activity alleged by the plaintiffs.  "[RICO] liability

depends on showing that the defendants conducted or participated in the conduct of the

enterprise's affairs, not just their own affairs."  Kushner, 533 U.S. at 163 (quoting Reves v. Ernst

& Young, 507 U.S. 170, 185 (1993)) (internal quotation marks omitted) (emphases in original).

        The Court therefore believes that it is appropriate "to look to the allegations in the

complaint to determine whether the parent's activities are sufficiently distinct from those of [its

subsidiaries] at the time that the alleged RICO violations occurred."  Bessette, 230 F.3d at 449

(citation omitted); see Buclew v. Hawkins, Ash, Baptie & Co., 329 F.3d 923, 934 (7th Cir. 2003)

(holding that a parent corporation and its wholly owned subsidiaries are not sufficiently distinct

for RICO purposes unless the plaintiff demonstrates that "the [RICO] enterprise's decision to

operate through subsidiaries rather than [intracorporate] divisions somehow facilitated its

unlawful activity") (citations omitted); Brannon, 153 F.3d at 1147 (concluding that "in order to

state a viable claim under [Section 1962(c)] against a [subsidiary] for conducting the affairs of its

parent corporation, a plaintiff must, at the very least, allege the parent somehow made it easier to

commit or conceal the fraud of which the plaintiff complains") (internal quotation marks and

citation omitted); Lorenz v. CSX Corp., 1 F.3d 1406, 1412 (3d Cir. 1993) (holding that "[a]

RICO claim under [Section 1962(c)] is not stated where the subsidiary merely acts on behalf of,

or to the benefit of, the parent").  This inquiry comports with Kushner, because it may well be

that NHS, NHSLV, and NHSMA, in undertaking the alleged predicate acts of mail and wire

fraud, are all "simply the same 'person' referred to by [three] different names."  Kushner, 533

U.S. at 161.  Unfortunately, the complaint as currently pled does not provide sufficient details for the Court to make this assessment.  See Belizan, 434 U.S. at 583.  Indeed, given the overall failure of the plaintiffs to provide "simple, concise, and direct" articulations of the factual allegations and legal claims being asserted against the defendants in the complaint, Fed. R. Civ. P. 8(e)(1); see supra note 3, there are a number of reasons to be skeptical that any of the three defendant corporations genuinely and independently acted through, or conducted the affairs of, either or both of the other two defendants in perpetrating the fraudulent conduct alleged by the plaintiffs.  See 18 U.S.C. § 1962(c).

First, as discussed earlier, supra note 5, the plaintiffs generally neglect to distinguish between the defendants when describing the factual underpinnings of the complaint and, specifically, their RICO claims.  See, e.g., Compl. ¶ 39 (alleging that "[t]he [d]efendants repeatedly used or caused others to sue the United States mails and interstate wires to further their scheme to misappropriate the [p]laintiffs' funds"); id. ¶ 40 (alleging that "[t]he [d]efendants maintained bank accounts . . . to hold the [plaintiffs'] funds"); id. ¶ 43 (alleging that "[t]he [d]efendants used the . . . deposits [wired to the plaintiffs' bank accounts] to obtain possession of and then to misappropriate the [p]laintiffs' funds"); id. ¶ 46 (alleging that "[t]he [d]efendants successfully concealed their misappropriation and misuse of [the] [p]laintiffs' funds until late 2003 and early 2004").  In fact, aside from the generic and conclusory allegations that each defendant is a distinct entity for the purposes of Section 1962(c) liability, see id. ¶¶ 50-52, 60-62, 70-72, the complaint generally treats, and refers to, the defendant corporations as if they were a single, undifferentiated mass.  Such imprecision makes it difficult, if not impossible, for the Court to parse the complaint in such a way as to understand the specific role each defendant

22

allegedly played—whether as a RICO person or a RICO enterprise—in the purportedly fraudulent scheme.[15]  More to the point, if the plaintiffs cannot separate one defendant's actions from another's, or even if they have simply failed to do so in their complaint, the Court surely cannot be expected to conclude from the complaint as pled that the defendants are distinct legal entities under Section 1962(c).  See Kushner, 533 U.S. at 161 (holding that "to establish liability under [Section 1962(c)] one must allege and prove the existence of two distinct entities").

Second, the plaintiffs' claims regarding the specific activities of each defendant through an alleged RICO enterprise are thoroughly unilluminating and do nothing to demonstrate, even for the purposes of the pleading stage of the litigation, that any of the defendants were "conduct[ing] or participat[ing] in the conduct of the enterprise's affairs, not just their own affairs," Kushner, 533 U.S. at 163 (internal quotation marks and citation omitted) (emphases in original).  See Compl. ¶ 51 (alleging that "NHS used its position as the parent of NHSLV and [NHSMA] to monitor and control their activities as certified providers of mental health services to the [p]laintiffs on behalf of the District of Columbia"); id. ¶ 61 (alleging that "NHSLV used its position as an affiliate of NHS and [NHSMA] to monitor and control their respective activities as certified providers of mental health services to the [p]laintiffs on behalf of the District of Columbia"); id. ¶ 71 (alleging that NHSMA "used its position as an affiliate of NHS and NHSLV to monitor and control their respective activities as certified providers of mental health services to the [p]laintiffs on behalf of the District of Columbia").  There is agreement among the

---

[15]  This is especially the case given the plaintiffs' claim that the RICO enterprise in question is alternately (1) each of the defendants individually; (2) each of the defendants in every possible combination, as an "associat[ion] in fact"; (3) the District of Columbia; and (4) the District of Columbia and each of the defendants in every possible combination, as an "associat[ion] in fact."  Compl. ¶¶ 50, 60, 70; see 18 U.S.C. § 1963(4) (defining a RICO enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity").

Circuits that "a separate [RICO] enterprise is not demonstrated by the mere showing that the [defendant] corporation committed a pattern of predicate acts in the conduct of its own business." Bd. of Cty. Comm'rs of San Juan Cty. v. Liberty Group, 965 F.2d 879, 885 (10th Cir. 1992); see also Riverwoods Chappaqua Corp., 30 F.3d at 344 (same); Elliott v. Foufas, 867 F.2d 877, 881 (5th Cir. 1989) (same).  As the defendants correctly observe, the plaintiffs' description of the alleged RICO enterprise as "an ongoing organization with a framework or structure for carrying out the District of Columbia's obligation to provide mental health services to its residents through the [d]efendants," Compl. ¶¶ 51, 61, 71, is simply "a description of [the defendants'] normal business activity," and nothing more.  Defs.' Mem. at 7; see Compl. ¶¶ 8-10 (alleging that the defendants have "provided mental health and other services to the [p]laintiffs and others in the District of Columbia . . . [and were], in fact, authorized by the Government of the District of Columbia to provide mental health services to the [p]laintiffs and others on its behalf").  This is not enough under RICO, as more detail is required to determine whether any of the defendants were conducting something other than their own, usual business activities in the course of perpetrating the alleged misappropriation and misuse of the plaintiffs' funds.

Third, the actual time line of each defendant's alleged activities with regard to the others and to plaintiffs Bates and Bell is confounding and muddled in almost every respect.  See supra note 7.  It appears from the complaint that NHS was certified by the DMH to provide mental health services in the District of Columbia beginning in 1996.  Compl. ¶ 54.  By contrast, NHSLV was allegedly certified to provide such services in 1999, and NHSMA in 2002.  Id. ¶¶ 64, 74.  There is no indication whether NHSLV or NHSMA participated in any scheme to defraud plaintiffs Bates and Bell, or to misappropriate or misuse the plaintiffs' funds, before their

own certification as mental health service providers.  Indeed, it is not even clear from the

complaint whether NHSLV or NHSMA existed as incorporated entities prior to their certification

by the District of Columbia.[16]  Nor is there any indication whatsoever of the date on which any of

the defendants were authorized to serve as representative payee for the plaintiffs or, having been

so authorized, began to perpetrate a scheme to fraudulently misappropriate the plaintiffs' funds.

See Compl. ¶ 30 (alleging that "[t]he [d]efendants were eventually approved by the SSA to act

[as representative payee] for Ms. Bates [and] Ms. Bell"); id. ¶ 33 (alleging generally that the

defendants violated the law "[f]rom the time that [they] were first appointed as representative

payee[s] to the present day").  The complaint is similarly silent as to whether the defendants

acted to misappropriate the funds of plaintiffs Bates and Bell individually or in concert, whether

one defendant began the misappropriation and the others joined the scheme once they became

appointed as representative payees, or whether the defendants served successively as the

plaintiffs' fiduciaries, passing the torch from one to the other and misappropriating the plaintiffs'

funds in turn.  These questions, answers to which would aid the Court greatly in understanding

the contours of the plaintiffs' RICO claims and thus the extent to which each defendant operated

as a separate and distinct entity from the alleged RICO enterprises, are simply not addressed.[17]

---

[16]  It hardly needs to be said that if either NHSLV or NHSMA did not exist at a time when one of the other defendants is alleged to have misappropriated the funds of plaintiffs Bates or Bell, it could not be named as an enterprise through which fraudulent acts relating to the alleged misappropriation were conducted.

[17]  The plaintiffs do claim that the three defendants conspired together to violate Section 1962(c), see Compl. ¶¶ 78-83; 18 U.S.C. § 1962(d), but such a claim requires the existence of a larger association-in-fact enterprise encompassing all three defendants, the requisite elements of which the plaintiffs have not clearly alleged, see Defs.' Reply at 9-11; see also United States v. Richardson, 167 F.3d 621, 625 (D.C. Cir. 1999) (holding that an association-in-fact enterprise must "involve[] some structure to distinguish an enterprise from a mere conspiracy") (internal quotation marks and citation omitted); United States v. Perholtz, 842 F.2d 343, 359 (D.C. Cir. 1988) (holding that such an enterprise must demonstrate a "continuity of structure and personnel" separate from the underlying criminal act); cf. Kushner, 533 U.S. at 164 (describing an alleged enterprise consisting of a corporation

(continued...)

Determining whether RICO persons are sufficiently separate and distinct from the RICO enterprise through which they have allegedly conducted their criminal affairs is a subtle and nuanced inquiry which requires that the Court weigh many discrete yet interrelated factors.  See Yellow Bus Lines, 883 F.2d at 139-41 (undertaking detailed analysis of the distinctiveness between RICO person and alleged RICO enterprise); see also, e.g., Fogie, 190 F.3d at 896-98 (same); Brannon, 153 F.3d at 1146-49 (same); Jaguar Cars, 46 F.3d at 262-69 (same); Haroco, 747 F.2d at 399-403 (same).  The plaintiffs' three Section 1962(c) claims, when viewed together and without the benefit of a clearly pled complaint, essentially collapse into a single allegation that the parent corporation, NHS, and its two subsidiaries, NHSLV and NHSMA, are each simultaneously a RICO person acting through the other entities in their roles as RICO enterprises and a RICO enterprise through which the other entities act as RICO persons.  Compl. ¶¶ 50, 60, 70.  Specifically, Count I of the plaintiffs' complaint names NHS as the person and the other defendants as one or more RICO enterprises; Counts II and III do likewise for NHSLV and NHSMA.  Id.  While alternative and inconsistent legal claims are certainly permitted at the pleading stage, Fed. R. Civ. P. 8(e)(2), this mishmash of claims serves to blur the factual landscape of the plaintiffs' allegations even further.[18]  The plaintiffs' description of the three alleged RICO enterprises, the role played by each defendant in the predicate acts, and the actual

---

[17](...continued)
and all of its employees and agents as an "oddly constructed entity").

[18]  In addition, the Court notes that at least one of the plaintiffs' RICO claims must ultimately fail—that is, as a factual matter, in order to ensure that the Section 1962(c) distinctiveness requirement is met, it is not possible for all three defendants to have been RICO enterprises to each other when undertaking the complained-of predicate acts of mail and wire fraud.  See Kushner, 533 U.S. at 161 (holding that "to establish liability under § 1962(c) one must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name").

relationship of each defendant to the others when the fraudulent conduct in question was allegedly committed, are couched so vaguely, and in such an all-encompassing manner, as to give this Court, and indeed the defendants themselves, an entirely insufficient sense of the scope or details of the plaintiffs' RICO allegations.  In short, the plaintiffs' RICO claims are so bereft of helpful detail that they are, in the main, merely "legal conclusion[s] couched as . . . factual allegation[s]," Trudeau, 456 F.3d at 193 (internal quotation marks and citations omitted), and the Court cannot determine from them whether the alleged RICO persons and the alleged RICO enterprises are sufficiently distinct, or even whether the claims asserted by the plaintiffs are of the general nature which Congress intended to address by its passage of Section 1962(c).  See Sedima, 473 U.S. at 497-98 (stating that "RICO is to be read broadly" in light of "Congress' self-consciously expansive language [and] its express admonition that RICO is to be liberally construed to effectuate its remedial purposes") (internal quotation marks and citation omitted)).  The plaintiffs' RICO claims must therefore be dismissed without prejudice.  See Belizan, 434 F.3d at 583 (holding that "a complaint that omits certain essential facts and thus fails to state a claim warrants dismissal under Rule 12(b)(6)[,] but not dismissal with prejudice").   However, for the reasons stated below, the Court will allow the plaintiffs an opportunity to amend their complaint to more clearly set forth the particulars of their Section 1962(c) claims.  See Yellow Bus Lines, 883 F.2d at 145 (granting plaintiffs leave to amend their complaint to remedy deficiencies in their RICO claims).

 *3. Rule 9(b)'s Heightened Pleading Requirement*

 Given that this Court is dubious whether the plaintiffs' factual allegations and legal claims rise even to the minimal threshold of Rule 8(e)'s requirement that "each averment of a

pleading . . . be simple, concise, and direct," Fed. R. Civ. P. 8(e)(1), it should come as no surprise

that the Court concludes that the plaintiffs' allegations regarding the predicate acts of mail and

wire fraud necessary to sustain a RICO claim are not pled with nearly the specificity required by

the heightened pleading standard of Rule 9(b). See Fed. R. Civ. P. 9(b) (stating that "[i]n all

averments of fraud . . . the circumstances constituting fraud . . . shall be stated with

particularity").  Accordingly, the Court agrees with the defendants that the plaintiffs have failed

to sufficiently allege "that the defendant[s] used the United States mail or wires in furtherance of

a scheme to defraud [the plaintiffs]."  Defs.' Mem. at 9 (internal quotation marks and citation

omitted).

It is well-settled in this and other Circuits that "[w]here acts of mail and wire fraud

constitute the alleged predicate racketeering [activity], these acts are subject to the heightened

pleading requirement of [Federal Rule of Civil Procedure] 9(b)."  Warden v. McLelland, 288

F.3d 105, 114 (3d Cir. 2002) (citation omitted); see, e.g., Peskoff v. Faber, 230 F.R.D. 25, 31-32

(D.D.C. 2005) (observing that "the particularity requirement of Rule 9(b) applies with full force

when fraud is identified as a predicate act to a pattern of racketeering activity under RICO")

(internal quotation marks and citation omitted); Lum v. Bank of Am., 361 F.3d 217, 223-24 (3rd

Cir. 2004) (applying Rule 9(b) to RICO action alleging predicate offense of mail fraud);

Lancaster Cmty. Hosp. v. Antelope Valley Hosp. Dist., 940 F.2d 397, 405 (9th Cir. 1991) (same);

Blount Fin. Servs., Inc. v. Walter E. Heller & Co., 819 F.2d 151, 152 (6th Cir. 1987) (holding

that "[f]raud alleged in a RICO civil complaint for mail fraud must state with particularity the

false statement of fact made by the defendant which the plaintiff relied on and the facts showing

the plaintiff's reliance on [the] defendant's false statement of fact"); Haroco, 747 F.2d at 405

(stating that "[t]here can be little doubt that [Rule 9(b)] . . . applies to fraud allegations in civil

RICO complaints") (citation omitted).  Rule 9(b) is designed, in part, "to allow a District Court

to distinguish valid from invalid claims . . . and to terminate needless litigation early in the

proceedings," Blount Fin. Servs., 819 F.2d at 153, and the defendants here argue that the

plaintiffs have not provided sufficient detail regarding their asserted claims of mail and wire

fraud for the Court to determine whether the claims are valid or for the defendants themselves to

be properly on notice as to the substance and particulars of the alleged fraudulent conduct, Defs.'

Mem. at 9-12; see United States ex rel. Williams v. Martin-Baker Aircraft Co., 389 F.3d 1251,

1256 (D.C. Cir. 2004) (stating that "the requirements of Rule 9(b) guarantee all defendants

sufficient information to allow for preparation of a response") (internal quotation marks and

citation omitted); Kowal v. MCI Commc'ns Corp., 16 F.3d 1271, 1279 n.3 (D.C. Cir. 1994)

(stating that Rule 9(b) "attempts in part to prevent the filing of a complaint as a pretext for the

discovery of unknown wrongs") (internal quotation marks and citation omitted); Fink v. Nat'l

Sav. and Trust Co., 772 F.2d 951, 963 (D.C. Cir. 1985) (stating that Rule 9(b) is intended "to

give defendants fair notice of the plaintiffs' claims and grounds therefore, so that they can frame

their answers and defenses") (internal quotation marks and citation omitted).  Specifically, the

defendants contend, inter alia, that the plaintiffs' allegations are deficient because they (1) "fail to

disclose the details, including dates, content of conversations, time, or place necessary in

pleading a fraud allegation with specificity," Defs.' Reply at 11; (2) "never indicate which

[d]efendant, or which agent of which [d]efendant, made misrepresentations to which [p]laintiff,"

id. (citation omitted); and (3) do not allege "how [the] [p]laintiffs were deceived by [the

defendants'] alleged misrepresentations made through the mail," id. at 12.  The Court agrees with

the defendants that the plaintiffs' allegations of mail and wire fraud are plainly deficient under Rule 9(b).

Plaintiffs alleging mail and wire fraud must satisfy two essential elements: "(1) a scheme to defraud; and (2) use of the mails or wires for the purpose of executing the scheme." United States v. Howard, 245 F. Supp. 2d 24, 31 (D.D.C. 2003) (quoting United States v. Alston, 609 F.2d 531, 536 (D.C. Cir. 1979)) (internal quotation marks omitted); see 18 U.S.C. §§ 1341, 1343. In accordance with Rule 9(b), plaintiffs alleging fraud must further "state the time, place and content of the false misrepresentations, the fact misrepresented[,] and what was retained or given up as a consequence of the fraud." Martin-Baker Aircraft, 389 F.3d at 1256 (internal quotation marks and citation omitted); see Intex Recreation Corp. v. Team Worldwide Corp., 390 F. Supp. 2d 21, 24 (D.D.C. 2005) (stating that "[t]he particularity requirement of Rule 9(b) demands that the pleader specify what [fraudulent] statements were made and in what context, when they were made, who made them, and the manner in which the statements were misleading") (citation omitted); Haroco, 747 F.2d at 405 (finding that complaint satisfied the Rule 9(b) standard where it "adequately specified the transactions, the content of the allegedly false representations, and the identities of those involved"). Moreover, "[c]ourts have been particularly sensitive to [Rule 9(b)'s] pleading requirements in RICO cases in which the 'predicate acts' are mail fraud and wire fraud, and have further required specific allegations as to which defendant caused what to be mailed . . . and when and how each mailing . . . furthered the fraudulent scheme." Gotham Print, Inc. v. Am. Speedy Printing Ctrs., Inc., 863 F. Supp. 447, 458 (E.D. Mich. 1994) (citing cases) (emphases omitted).

Here, the plaintiffs clearly fail to allege "which defendant caused what to be mailed" or transmitted by wire in connection with the predicate acts of mail and wire fraud, as well as specifically "when and how each mailing [or transmission] . . . furthered the fraudulent scheme." Id.  To take one example, the plaintiffs contend that

> 52.   NHS knowingly and willfully conducted or participated directly or indirectly in the conduct of the enterprise's affairs through a pattern of racketeering activity [which] . . . included, but was not limited to (a) repeated acts of mail fraud in violation of 18 U.S.C. § 1341, and (b) repeated acts of wire fraud in violation of 18 U.S.C. § 1343, all in connection with the provision of mental health services to the [p]laintiffs on behalf of the District of Columbia.  The fraudulent scheme and instances of mail and wire fraud included those that are described more fully above.

> 53.   The [d]efendants' mail and wire fraud was composed of discrete acts having the same or similar purposes, results, participants, victims or methods of operation, or otherwise were interrelated by distinguishing characteristics and are not isolated events.  All such predicate acts had the misappropriation of [the] [p]laintiffs' funds as their goal.

Compl. ¶¶ 52-53.  This same language is repeated nearly verbatim, with only minimal and non-substantive alterations, for each of the defendants, and yet it is utterly unhelpful in discerning the meat of the plaintiffs' allegations regarding the purported fraud.  See id. ¶¶ 62-63, 72-73.  The plaintiffs' unmitigated vagueness regarding which defendant played which role in the fraudulent conduct is surely inconsistent with the heightened pleading requirement of Rule 9(b).  See Martin-Baker Aircraft, 389 F.3d at 1256.

Nor do "[t]he fraudulent scheme and instances of mail and wire fraud . . . that are described more fully" elsewhere in the plaintiffs' complaint suffice to meet Rule 9(b)'s particularity requirement.  Compl. ¶ 52.  Rather, the plaintiffs' description of how "[t]he [d]efendants repeatedly used or caused others to use the United States mails and interstate wires

to further their scheme to misappropriate the [p]laintiffs' funds," id. ¶ 39, consists solely of "nebulous[] alleg[ations]" concerning bank deposits and transfers, bank account statements, and the transmission of benefits payments from the government to the bank or to the defendants directly, Martin-Baker Aircraft, 389 F.3d at 425.  Compl. ¶¶ 39-44.  The transactions alleged by the plaintiffs thus amount to nothing more than routine banking activity relating to the defendants' status as the plaintiffs' representative payee, and the plaintiffs have provided no support for the somewhat remarkable proposition that the reach of the mail and wire fraud statutes is intended to encompass, for example, the mailing of monthly bank account statements from a bank to its registered account holder.  See Pls.' Opp. at 13 (contending that the bank account statements enabled the defendants "to monitor and advance their unlawful scheme to defraud the [p]laintiffs[] of their money"); cf. Bonavitacola Elec. Contractor, Inc. v. Boro Developers, Inc., 87 Fed. Appx. 227, 232 (3d Cir. 2003) (affirming dismissal of a RICO mail fraud claim under Rule 9(b) and finding that it was "not at all clear from the [complaint] how [the transmission of certified payroll reports] relate to an underlying fraudulent scheme").

Yet, even if these transactions could be said to be "incident to an essential part" of the defendants' fraudulent scheme, Schmuck v. United States, 489 U.S. 705, 710-11 (1989) (internal quotation marks and citation omitted), the plaintiffs have failed to specify in their complaint "what [fraudulent] statements were made and in what context, when they were made, who made them, and the manner in which the statements were misleading," Intex, 390 F. Supp. 2d at 24 (citations omitted).  Although the scheme allegedly furthered through the use of the mail and interstate wires was "to misappropriate the [p]laintiffs' funds," Compl. ¶ 39, the fraudulent conduct alleged by the plaintiffs appears to concern representations made to entities or persons

other than the plaintiffs themselves, <u>see</u>, <u>e.g.</u>, <u>id.</u> ¶ 40 (alleging that "[t]he [d]efendants

fraudulently represented to the banks that they were . . . properly managing the [p]laintiffs'

funds").  A RICO plaintiff, however, "only has standing if . . . he has been injured . . . by the

conduct constituting the violation," <u>Sedima</u>, 473 U.S. at 496, an unexceptional requirement

which buttresses the need for the plaintiffs to plead not only actual fraud, but actual fraud

<u>directed at the plaintiffs</u>.  See <u>Anza v. Ideal Steel Supply Co.</u>, ___ U.S. ____, ____, 126 S. Ct.

1991, 1996-97 (June 5, 2006) (holding that the plaintiff had not suffered an injury under Section

1962(c) where "the direct victim of [the alleged mail and wire fraud]" was not the plaintiff, but

the State of New York).  As the Sixth Circuit has stated, "the defendant must make a false

statement or omission of fact <u>to the plaintiff</u> to support a claim of wire fraud or mail fraud as a

predicate act for a RICO claim." <u>Cent. Distributors of Beer, Inc. v. Conn</u>, 5 F.3d 181, 184 (6th

Cir. 1993) (emphasis in original); <u>see Shahmirzadi v. Smith Barney, Harris Upham & Co</u>, 636 F.

Supp. 49, 54 (D.D.C. 1985) (noting that the Rule 9(b) standard requires, among other things, a

showing that the allegedly fraudulent statements "misled the <u>plaintiff</u>") (citation omitted)

(emphasis added).  Here, the plaintiffs allege at best that the defendants used the mail or wires to

make false statements in furtherance of their fraudulent scheme to banks, Compl. ¶¶ 40-41, to the

federal and District of Columbia governments, <u>id.</u> ¶¶ 43-44, and possibly to persons other than

the plaintiffs, <u>id.</u> ¶¶ 43-44, 46, but <u>not</u> to the plaintiffs themselves.  The Court is therefore not

inclined, without more, to view the plaintiffs as "the direct victim[s]" of the defendants'

purportedly fraudulent statements made to third parties in a manner sufficient to sustain the

plaintiffs' predicate claims of mail and wire fraud.[19]  Anza, ___ U.S. at ____, 126 S.Ct. at 1996-97.

Furthermore, despite the plaintiffs' contention that "[t]he time, place, speaker and content of each fraudulent use of the mails and wires is specified in paragraphs 40-46 of the Complaint," Pls.' Opp. at 13, such details are conspicuously absent from the bulk of the plaintiffs' allegations.[20]  See generally Compl. ¶¶ 40-46.  Specifically, as discussed in note 7, supra, the complaint utterly fails to provide a date on which the fraudulent scheme alleged by the plaintiffs commenced.  See Martin-Baker Aircraft, 389 F.3d at 1256-57 (finding that the complaint's "allegations regarding the time of the false misrepresentations [were] entirely inadequate" where the complaint failed to "allege a start date" for the fraudulent conduct in question) (internal quotation marks and citation omitted).  In addition, contrary to the requirement that a plaintiff asserting mail or wire fraud make "specific allegations as to which defendant caused what to be mailed," Gotham Print, 863 F. Supp. at 457 (emphases omitted), the plaintiffs here again do not distinguish between the defendants when setting forth the manner in which "the United States mails and interstate wires [were used] to further [the defendants'] scheme to misappropriate the

---

[19]  The Court notes that the plaintiffs here, unlike the plaintiffs in Anza and Cent. Distributors of Beer, are alleged to be "disabled due to mental illness," Compl. ¶¶ 6-7, a circumstance which could have a bearing on the question of whether knowingly fraudulent representations to third parties with the intent of "misappropriati[ng] the [p]laintiffs' funds," id. ¶ 53, could constitute mail and wire fraud against the plaintiffs themselves.  See Sedima, 473 U.S. at 496 (stating that a RICO plaintiff "only has standing if . . . he has been injured . . . by the conduct constituting the violation").  However, because the plaintiffs' allegations of mail and wire fraud are insufficiently pled with particularity in numerous other respects, see generally Part III.A.iii, the Court need not decide this issue.

[20]  With the exception of (1) a number of specific dates on which the plaintiffs allege that "the [d]efendants caused bank account statements to be sent to them," Compl. ¶ 41; and (2) the claim that the plaintiffs' benefits payments were mailed or transferred to the defendants "at least once each month for several years before [the defendants] curtailed their operations [in the District of Columbia] in June 2004," id. ¶ 43; see also id. ¶ 44, the plaintiffs fail to provide any detail regarding "when and how each mailing [or transmission] . . . furthered the fraudulent scheme."  Gotham Print, 863 F. Supp. at 457.

[p]laintiffs' funds," Compl. ¶ 39.  Requiring the three defendants to guess amongst themselves

which one is responsible for the instances of mail and wire fraud alleged by the plaintiffs is

surely not in keeping with the purposes of Rule 9(b).  See Martin-Baker Aircraft, 389 F.3d at

1256 (stating that "the requirements of Rule 9(b) guarantee all defendants sufficient information

to allow for preparation of a response") (internal quotation marks and citation omitted); Intex,

390 F. Supp. 2d at 24 (stating that Rule 9(b) "demands that the pleader specify . . . who made

[the allegedly fraudulent statements]") (citation omitted).   Finally, the complaint does not

specifically "identify the purpose of the mailing[s] [and wire transmissions] within the

defendant[s'] fraudulent scheme," Tal v. Hogan, 453 F.3d 1244, 1263 (10th Cir. 2006) (internal

quotation marks and citation omitted); see also Bonavitacola, 87 Fed. Appx. at 231 (stating that

"[i]n the context of RICO mail fraud allegations, . . . a complaint must identify the purpose of the

mailing within the defendant's fraudulent scheme") (internal quotation marks and citation

omitted); Moore v. PaineWebber, Inc., 189 F.3d 165, 173 (2d Cir. 1999) (same), instead alleging

generally that "[t]he use of the United States mails, telephone lines, and facsimile and Internet

modalities were instrumental in carrying out the [defendants'] pattern of racketeering activity,"

Compl. ¶¶ 56, 66, 76.  At bottom, the Court concludes that the plaintiffs' allegations regarding

mail and wire fraud are deficient under Rule 9(b) because they, like the plaintiffs' other

generalized claims regarding the defendants' alleged RICO violations, see Part III.A.2, supra, do

not "give [the] defendants fair notice of the plaintiffs' claims and grounds therefore, so that they

can frame their answers and defenses," Fink, 772 F.2d at 964, or allow the Court "to distinguish

valid from invalid claims . . . and to terminate needless litigation early in the proceedings,"

Blount Fin. Servs., 819 F.2d at 152.

Having concluded that the plaintiffs' predicate fraud claims do not meet the heightened

pleading standard mandated by Rule 9(b), the Court will dismiss the plaintiffs' RICO claims

without prejudice and afford them an opportunity to amend their complaint pursuant to Federal

Rule of Civil Procedure 15(a) in order to correct the deficiencies this Court has articulated above,

if it is possible to do so.  See Fed. R. Civ. P. 15(a) (stating a party may amend its pleading "by

leave of court" and directing that "leave shall be freely given when justice so requires"); Belizan,

434 F.3d at 584 (stating that "the heightened pleading standard of Rule 9(b), which requires a

plaintiff to plead any allegation of fraud with specificity, does not alter the operation of Rule

15(a)") (citation omitted); Firestone v. Firestone, 76 F.3d 1205, 1209 (D.C. Cir. 1996) (observing

that "leave to amend is almost always allowed to cure deficiencies in pleading fraud") (internal

quotation marks and citation omitted); see also Yellow Bus Lines, 883 F.2d at 145 (granting

plaintiffs leave to amend their complaint to remedy deficiencies in their RICO claims); Saporito

v. Combustion Eng'g Co., 843 F.2d 666, 675-76 (3d Cir. 1988), judgment vacated on other

grounds, 489 U.S. 1049 (1989) (permitting amendment of RICO complaint which failed to plead

predicate acts of mail and wire fraud with sufficient particularity under Rule 9(b)); New England

Data Servs., Inc. v. Becher, 829 F.2d 286, 291-92 (1st Cir. 1987) (same); Ray v. Karris, 780 F.2d

636, 645 (7th Cir. 1985) (same).

*B. The Plaintiffs' Section 1983 Claim*

The defendants argue that the plaintiffs do not state a claim under 42 U.S.C. § 1983

because (1) the defendants were not acting under color of state law when they allegedly

misappropriated the plaintiffs' federal benefits payments, Defs.' Mem. at 20-26; and (2) the

alleged misappropriation did not deprive the plaintiffs of a relevant and enforceable right

protected by the Constitution or the laws of the United States, id. at 14-17; 26-27.  In return, the

plaintiffs contend that the defendants' provision of mental health services through the District of

Columbia transformed them into state actors vis-à-vis the plaintiffs, Pls.' Opp. at 17-23, and that

the Social Security and SSI benefits payments allegedly misappropriated by the defendants

"constituted property in which [the plaintiffs] had a protected interest under the Fifth and

Fourteenth Amendments" and to which they were legally entitled by the applicable federal

statutes and regulations, id. at 14-16.  Here again, the Court concludes that it lacks sufficient

information, on the strength of the complaint, to determine whether the defendants could be

considered state actors in their role as the plaintiffs' representative payee, which is the gravamen

of this litigation.  See Compl. ¶ 3 (stating that "[t]his is an action to require [the] [d]efendants to

account for the monetary value of the benefits entrusted to them as the [p]laintiffs' representative

payee").  The Court will therefore dismiss the plaintiffs' Section 1983 claim without prejudice

and grant them leave to amend their complaint to set out the claim with greater clarity, if they

can.

> Section 1983 provides, in relevant part, that:
>
> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.  Therefore, to state a claim under Section 1983, the plaintiffs must allege that

the defendants (1) acted under color of state law in (2) depriving them of a right secured by the

Constitution or by federal law.  See Nelson v. Campbell, 541 U.S. 637, 643 (2004) (articulating

elements of Section 1983 liability).  The Supreme Court has held that "[i]n cases under [Section

1983], 'under color' of law has consistently been treated as the same thing as the 'state action' required under the Fourteenth Amendment." Rendell-Baker v. Kohn, 457 U.S. 830, 838 (1982) (internal quotation marks and citations omitted).  In determining liability under Section 1983, the "ultimate issue" therefore becomes whether "the alleged infringement of federal rights [is] fairly attributable to the state."  Id. (internal quotation marks and citation omitted).

The defendants claim that they cannot be considered state actors under any of the tests or formulae the Supreme Court has developed to make that determination.  Defs.' Mem. at 21. Specifically, the defendants argue that they are not state actors because (1) neither the provision of mental health services to the public nor the duties of a representative payee are "traditionally the exclusive prerogative of the State," id. (quoting Rendell-Baker, 457 U.S. at 842) (internal quotation marks omitted); (2) the contractual relationship between the DMH and the defendants to provide mental health services in the District of Columbia does not signify a "mutual interdependence" of the defendants and the District such that the defendants were acting under color of state law in providing these services, id. at 23-24; and (3) although the defendants "are subject to governmental regulations established by the state in operating facilities and providing mental health/mental retardation services," there does not exist "a sufficiently close nexus between the state and the challenged action of the regulated entity so that the action may be fairly treated as that of the state itself," id. at 24 (quoting Jackson v. Metro. Edison Co., 419 U.S. 345, 351 (1974)) (internal quotation marks omitted).  The plaintiffs argue in response that by virtue of the DMH's delegation to the defendants of its legal obligation to provide mental health services to District residents, the defendants assumed responsibility of "a mandatory [District of Columbia] government function," Pls.' Opp. at 20, and the District of Columbia "must be

38

recognized as a joint participant in the challenged activity," id. at 22 (quoting Burton v.

Wilmington Parking Auth., 365 U.S. 715, 725 (1961)) (internal quotation marks omitted).  Thus,

the plaintiffs contend "that the [d]efendants were engaged in a public function when they

obtained and misappropriated [the] [p]laintiffs' money."  Id. at 18.

It is clear that both parties' arguments address whether the defendants' authorization by

the DMH to provide mental health services in the District of Columbia caused them to become

state actors for the purposes of Section 1983.  See Compl. ¶¶ 8-10 (alleging that the defendants

were "authorized by the Government of the District of Columbia . . . to provide mental health

services to [the] [p]laintiffs and others on its behalf, and [were] at all times relevant to this

complaint acting under the color of state law"); Defs.' Mem. at 22 (arguing that "the [mental

health] services [the] [d]efendants provide[d] [did] not [amount to] state action"); Pls.' Opp. at

20 (arguing that "when [the DMH] delegated [the provision of mental health services] by

contract to the [d]efendants, they became state actors").  But this is not the principal inquiry that

the Court must conduct.  According to the Supreme Court, "state action may be found if, though

only if, there is such a close nexus between the State and the challenged action that seemingly

private behavior may be fairly treated as that of the State itself."  Brentwood Acad. v. Tenn.

Secondary Sch. Athletic Ass'n, 531 U.S. 288, 295 (2001) (internal quotation marks and citation

omitted) (emphasis added).  The challenged action in this case is the defendants' alleged

deprivation of the plaintiffs' federally protected right to the proper accounting, use, and receipt of

their federal benefits payments while serving as the plaintiffs' representative payee.  Compl. ¶¶

84-90.  That is, it is the alleged fraud and misappropriation of the plaintiffs' funds resulting from

the defendants' representative payee status, and not the purported misprovision of mental health

services resulting from the defendants' status as DMH-authorized mental health service

providers, that is the gravamen of the plaintiffs' Section 1983 claim.  The defendants served two

interrelated but decidedly distinct roles as related to the plaintiffs—that of their DMH-authorized

service provider and their SSA-certified representative payee—and the plaintiffs' allegations

relating to the misappropriation of their federal benefits payments directly implicate only the

second of these roles and not the first.  See id. ¶ 27 (alleging that the defendants were authorized

by the District of Columbia to be mental health service providers); id. ¶ 30 (alleging that the

defendants were appointed by the SSA to act as the plaintiffs' representative payee for federal

benefits payments).  To sustain their Section 1983 claims, the plaintiffs must demonstrate that

they were deprived of a federally protected right by a person who was acting under color of state

law in depriving them of that right.  See Kentucky v. Graham, 473 U.S. 159, 166 (1985) (stating

that Section 1983 liability accrues when a person, "acting under color of state law, cause[s] the

deprivation of a federal right") (citation omitted).  Here, the federally protected right at issue is

not the plaintiffs' right to receive mental health services, but rather their entitlement to federal

benefits payments under the Fifth and Fourteenth Amendments and the Social Security Act.  See

Pls.' Opp. at 14-16.  Thus, even assuming that the defendants were acting under color of state

law in their capacity as a DMH-authorized service provider, the plaintiffs have provided no

support for the proposition that the defendants must then be considered state actors in their

capacity as an SSA-certified representative payee.

Indeed, the plaintiffs have not even alleged that the defendants' status as representative

payee is necessarily contingent on their providing mental health services to the plaintiffs on

behalf of the District of Columbia, even assuming arguendo that in performing the latter function

40

the defendants were acting under color of state law.  Nor do they contend that all DMH-

authorized service providers also serve as representative payees for the District residents to

whom they administer mental health services.  Instead, the plaintiffs claim only that "[i]n the

course of providing government-sponsored mental health services to the [p]laintiffs, the

[d]efendants had themselves appointed as the 'representative payee' for the [p]laintiffs' social

security and other benefits payments," Compl. ¶ 2, an ambiguous allegation which does not

advance the proposition that the defendants' allegedly unconstitutional and unstatutory actions

while serving as the plaintiffs' representative payee are "fairly attributable to the state."  Am.

Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 58 (1999) (also noting that this criterion is "an

essential element of [a] § 1983 claim").

　　　　For this reason, the Court simply does not have a clear picture, from the facts set forth in

the complaint, regarding whether the defendants' purported misappropriation of the plaintiffs'

federal benefits payments—an act which the plaintiffs concede could not have occurred had the

defendants not been serving as the plaintiffs' federally-appointed representative payee, see

Compl. ¶ 30—was undertaken under the color of state law.  It is insufficient merely to argue, as

the plaintiffs do, that the defendants were state actors in some other capacity with regard to their

relationship with the plaintiffs.  See Brentwood Acad., 531 U.S. at 295 (holding that "state action

may be found if, though only if, there is such a close nexus between the State and the challenged

action that seemingly private behavior may be fairly treated as that of the State itself") (internal

quotation marks and citation omitted) (emphasis added).  To the extent that the plaintiffs might

be able to assert that the defendants would not have been appointed as representative payees by

the SSA, and therefore would not have been in a position to misappropriate the plaintiffs' federal

benefits payments, had they not represented themselves to that agency as acting under color of state law in providing the plaintiffs' mental health services, such an assertion is clearly not made in the complaint or in the responsive pleadings.  See Compl. ¶¶ 29-30 (alleging only that "[t]he [d]efendants soon determined that providing mental health services to the [p]laintiffs on behalf of the District of Columbia enabled them to take control of the [p]laintiffs' financial affairs" and that consequently "[t]he [d]efendants applied to the [SSA] to be appointed as [the] [p]laintiffs' representative payee for federal benefits payments . . . [and] were eventually approved").  And to presume that such a position is being advanced by the plaintiffs simply requires this Court to make too great an inferential leap.  Indeed, the plaintiffs do not allege whatsoever that the SSA would not have appointed the defendants as the plaintiffs' representative payee had the defendants not been providing mental health services for the District of Columbia, see generally Compl., and while the relevant statutes indicate that the defendants might be given preference in being selected as a representative payee due to their contract with the DMH, 42 U.S.C. §§ 405(j)(2)(C)(v) and 1383(a)(2)(B)(vii), nowhere do these statutes require that an organization be operating under color of state law, or as a mental health service provider, in order to be appointed as a representative payee, or guarantee that such organizations will be granted representative payee status, see 42 U.S.C. §§ 405(j)(2)(A) and 1383(a)(2)(B) (requiring an investigation of applicants as well as "adequate evidence" that they will be suitable representative payees).[21]

---

[21] Indeed, even under the subclauses mandating that preference be given to representative payee applicants who are "a designee" of a state health agency like the DMH provide that such applicants should only be appointed "if the Commissioner of Social Security deems it appropriate."  42 U.S.C. §§ 405(j)(2)(C)(v)(IV) and 1383(a)(2)(B)(vii)(IV).

In short, the connection, if such a connection is being alleged by the plaintiffs, between (1) the defendants allegedly acting under color of state law in providing mental health services to the plaintiffs and (2) the defendants depriving the plaintiffs of their purported right to federal benefits payments while serving as the plaintiffs' representative payee is far too tenuous.  To sustain their Section 1983 claim, the plaintiffs must demonstrate that "there is such a close nexus between" the District of Columbia and the misappropriation of the plaintiffs' funds by their representative payee that the misappropriation "may fairly be treated as that of the [District] itself."  Brentwood Acad., 531 U.S. at 295.  From the facts alleged in the complaint, the plaintiffs have not done this, and their Section 1983 claim will therefore be dismissed without prejudice. See Belizan, 434 F.3d at 583 (holding that "a complaint that omits certain essential facts and thus fails to state a claim warrants dismissal under Rule 12(b)(6)[,] but not dismissal with prejudice"). Again, however, because the Court is granting the plaintiffs leave to amend their complaint to attempt to cure the deficiencies in their RICO claims, it finds that it is in the interests of justice to allow the plaintiffs to reassert the basis for their Section 1983 claim with greater clarity as well. See Fed. R. Civ. P. 15(a) (stating a party may amend its pleading "by leave of court" and directing that "leave shall be freely given when justice so requires").

   *C. The Plaintiffs' Claims under 42 U.S.C. §§ 405 and 1383*

   The defendants argue that Counts VI and VII of the plaintiffs' complaint, which allege violations of 42 U.S.C. §§ 405 and 1383 and their implementing regulations, 20 C.F.R. §§ 404.2001 et seq. and 416.601 et seq., should be dismissed because these statutes neither confer a private right of action nor create a private remedy enabling litigants to pursue a claim under the statutes in federal courts.  Defs.' Mem. at 13-20; Defs.' Reply at 14-18; see also Compl. ¶¶ 91-

104.  The plaintiffs counter that "it is clear from the statutory language and overall legislative scheme that the congressional intent was to give a beneficiary the right to have his/her payments handled properly by a representative payee ."  Pls.' Opp. at 23.  The plaintiffs further assert that, in enacting the representative payee provisions, Congress clearly intended "to allow the beneficiary to sue the representative payee in a court of competent jurisdiction based on violations of the statutes."  Id.  However, after carefully examining the relevant statutes and regulations, the Court concludes that whether or not Congress intended to create a private right under the representative payee provisions of 42 U.S.C. §§ 405 and 1383, there is no indication of further congressional intent to fashion a privately enforceable remedy for such a right.  See Alexander v. Sandoval, 532 U.S. 275, 290 (2001) (noting that "some remedial schemes foreclose a private cause of action to enforce even those statutes that admittedly create substantive private rights").  The Court therefore grants the defendants' motion to dismiss these counts of the complaint with prejudice.

    As the Supreme Court has repeatedly stated, "the fact that a federal statute has been violated and some person harmed does not automatically give rise to a private cause of action in favor of that person."  Touche Ross & Co. v. Redington, 442 U.S. 560, 568 (1979) (internal quotation marks and citation omitted); see also Tax Analysts v. IRS, 214 F.3d 179, 185 (D.C. Cir. 2000) (observing that "violation of a federal statute alone is inadequate to support a private cause of action").  Rather, "private rights of action to enforce federal law must be created by Congress," Alexander, 532 U.S. at 286 (citing Touche Ross, 442 U.S. at 578), and courts must therefore determine whether a congressional statute "displays an intent to create not just a private right but also a private remedy," id. (citation omitted).  When undertaking such an inquiry,

"[s]tatutory intent . . . is determinative," id. (citation omitted), and "legal context matters only to the extent it clarifies text," id. at 288.  If a statute does not clearly indicate the existence of a privately enforceable remedy, "courts may not create one, no matter how desirable that might be as a policy matter[] or how compatible with the statute."  Id. at 286-87 (citations omitted).

In determining whether Congress intended the representative payee provisions of 42 U.S.C. §§ 405 and 1383 to confer a private cause of action, the Court "must begin with the language of the statute itself."  Touche Ross, 442 U.S. at 568 (citations omitted).  As an initial matter, it is clear that nothing in these statutes expressly states that a beneficiary may file a lawsuit against a representative payee who has misused his or her benefits payments or otherwise violated the terms of the representative payee provisions.  See generally 42 U.S.C. §§ 405(j) et seq. and 1383(a) et seq.  Instead, the statutes appear to envision the Commissioner of Social Security as the conduit through which an aggrieved beneficiary will recover monies as compensation for payments misappropriated or misused by the representative payee, see 42 U.S.C. §§ 405(j)(5), 405(j)(7)(A), 1383(a)(2)(E), and 1383(a)(2)(H)(i), and further contemplate that the Commissioner will then hold the representative payee liable for repaying the misused benefits to the SSA, see id.  Nowhere do the statutes talk about beneficiaries being compensated for their misused benefits payments directly from the representative payee.  See generally 42 U.S.C. §§ 405(j) et seq. and 1383(a) et seq.  Indeed, the representative payee provisions of 42 U.S. §§ 405 and 1383 do not focus on the beneficiaries, but on the Commissioner of Social Security and, to a lesser extent, on the representative payees themselves.  See generally 42 U.S.C. §§ 405(j) et seq. and 1383(a) et seq.; see also Alexander, 532 U.S. at 289 (finding that no private

45

remedy was created by a statute which "focuse[d] neither on the individuals protected nor even on the funding recipients being regulated, but on the agencies that will do the regulating").

Even without resort to a private cause of action, beneficiaries whose representative payees have misused their benefits are compensated by the express terms of the statutory language. Whenever (as here) "a representative payee that . . . is not an individual . . . misuses all or part of an individual's benefit [payment]," the statutes hold the Commissioner of Social Security strictly liable for compensating the beneficiary in "an amount equal to the amount of such benefit so misused." 42 U.S.C. §§ 405(j)(5)(A) and 1383(a)(2)(E)(i). These provisions then require the Commissioner of Social Security to "make a good faith effort to obtain restitution [of misused benefits payments] from the terminated representative payee," id. §§ 405(j)(5) and 1383(a)(2)(E). Viewed as a whole, this language, which in the SSI statute falls under the provision entitled "Restitution," id. § 1383(a)(2)(E), strongly suggests that Congress did not intend an alternative method by which beneficiaries could recoup misappropriated benefits from their representative payee. This conclusion is underscored by another provision in each statute, which states that representative payees who are found to have misused benefit payments "shall be liable for the amount misused," and then tasks the Commissioner, if he is able to "recover[] all or any part of such amount," to pay "an amount equal to the recovered amount to [the beneficiary]" to the extent that the beneficiary has not already been compensated by the Commissioner under the strict liability provisions of §§ 405(j)(5) and 1383(a)(2)(E). 42 U.S.C. §§ 405(j)(7) and 1383(a)(2)(H). When discussing the liability of a representative payee to return misused benefits, these provisions therefore appear only to contemplate that such benefits will be "recover[ed]" by the Commissioner and then (if needed) distributed to the beneficiary, not that

the beneficiary will personally be able to hold the representative payee liable in court.  Id.; see also Alexander, 532 U.S. at 289 (finding that no private remedy was created by a statute which "focuse[d] neither on the individuals protected nor even on the funding recipients being regulated, but on the agencies that will do the regulating").  That is, the liability provisions of 42 U.S.C. §§ 405 and 1383 appear to operate in conjunction as follows:  First, if it is determined that "a representative payee . . . that is not an individual" has misused all or part of a federal benefits payment to which a beneficiary is entitled under these statutes, the Commissioner is required to compensate that beneficiary for the amount that has been misused.[22]  42 U.S.C. §§ 405(j)(5)(A) and 1383(a)(2)(E)(i).  In addition, the Commissioner must terminate payments to that representative payee, id. §§ 405(j)(1)(A) and 1383(a)(2)(A)(iii), and "make a good faith effort to obtain restitution from the terminated representative payee," id. §§ 405(j)(5) and 1383(a)(2)(E).  Finally, if for any reason the beneficiary has not been fully compensated under the strict liability provisions of §§ 405(j)(5) and 1383(a)(2)(E)—an eventuality which should not occur where the representative payee, like the defendants here, "is not an individual," id.—the Commissioner must pay the beneficiary an amount equal to the amount of funds recovered from the representative payee, id. §§ 405(j)(7)(A) and 1383(a)(2)(H)(i), as long as the total amount paid to the beneficiary in this manner does not exceed the amount misused, id. §§ 405(j)(7)(B) and 1383(a)(2)(H)(ii).

---

[22]  If the representative payee is an individual, the Commissioner is nevertheless strictly liable to the beneficiary for any amount misused if the payee "served fifteen or more [beneficiaries]" in the month during which the misuse is alleged to have occurred.  42 U.S.C. §§ 405(j)(5)(B) and 1383(a)(2)(E)(ii).  If the representative payee is an individual serving fewer than fifteen beneficiaries, the Commissioner is not liable to an aggrieved beneficiary under these subsections for misused benefits, but must still "make a good faith effort" to recover such benefits from the payee, id. §§ 405(j)(5) and 1383(a)(2)(E), and then pay "an amount equal to the recovered amount to [the beneficiary]," id. §§ 405(j)(7)(A) and 1383(a)(2)(H)(i).

Therefore, because an aggrieved beneficiary whose representative payee is not an individual is guaranteed to be paid an amount equal to his or her misused benefits by the Commissioner under these provisions, id. §§ 405(j)(5)(A) and 1383(a)(2)(E)(i), and because all aggrieved beneficiaries, including those whose representative payees are individuals, are at least guaranteed to be paid an amount equal to whatever the Commissioner is able to recover from the representative payee, id. §§ 405(j)(7)(A) and 1383(a)(2)(H)(i), it is particularly likely that Congress did not intend to create a privately enforceable remedy for civil damages against representative payees.  Otherwise, the beneficiary whose representative payee organization misused his or her funds could be compensated twice for the benefit misused.  Such a result would not be consistent with the statutes' explicit provisions prohibiting the Commissioner from paying a beneficiary more than the amount lost through misuse or misappropriation.[23]  42 U.S.C. §§ 405(j)(7)(B) and 1383(a)(2)(H)(ii) (stating in both provisions that "the total of the amount certified for payment to [a beneficiary] under [the twin provisions mandating payment by the Commissioner in the event that a representative payee misuses benefits] may not exceed the total benefit amount misused by the representative payee with respect to such individual").

Moreover, the statutory schemes at issue directly impose criminal liability on representative payees who "knowingly and willfully convert[] [federal benefits payments] to a

---

[23]  Read in conjunction with the provisions prohibiting the SSA from paying the beneficiary an amount greater than the total amount misused by the representative payee, 42 U.S.C. §§ 405(j)(7)(B) and 1383(a)(2)(H)(ii), the mandate in 42 U.S.C. §§ 405(j)(7)(A) and 1383(a)(2)(H)(I) that the representative payee "shall be liable for the amount misused" is most reasonably read as indicating that the representative payee is liable to the SSA and not to the beneficiaries themselves.  An alternative reading would prevent a windfall payment to the beneficiary only where, and to the extent that, the SSA recovered all or part of the misused benefits from the representative payee, and not where the beneficiary filed a civil action under the provision and was directly compensated for the misused benefits.  In the latter instance, if the representative payee was not an individual, the Commissioner would still be required under the statutes' strict liability provisions to pay the beneficiary the full amount misused or misappropriated.  42 U.S.C. §§ 405(j)(5)(a) and 1383(a)(2)(E).

use other than for the use and benefit of [the intended beneficiary]," 42 U.S.C. §§ 408(a)(5) and

1383a(a)(4) (2000), a further indication that the representative payee provisions should not be

construed, in the absence of clear language to the contrary, as creating a privately enforceable

remedy.  See City of Rancho Palos Verdes, Cal. v. Abrams, 544 U.S. 113, 121 (2005) (stating

that "the express provision of one method of enforcing a substantive rule suggests that Congress

intended to preclude others") (quoting Alexander, 532 U.S. at 290) (internal quotation marks

omitted); see also 42 U.S.C. §§ 405(j)(1)(A) and 1383a(a)(2)(A)(iii) (requiring the SSA to

terminate representative payee status of any entity found to have misused benefits payments); id.

§§ 405(j)(4)(A)(1) and 1383a(a)(2)(D)(i) (prohibiting representative payee found to have misused

benefits payments from collecting monthly fee from beneficiary).[24]

The plaintiffs place great weight on the statutes' multiple references to "a court of

competent jurisdiction" determining that a representative payee has misused benefits payments.

Pls.' Opp. at 26-27 (contending that such language does not "preclude[] an action by a

beneficiary"); see 42 U.S.C. §§ 405(j)(1)(A) and 1383a(a)(2)(A)(iii); id. §§ 405(j)(4)(A)(1) and

1383a(a)(2)(D)(I); §§ 405(j)(7)(A) and 1383a(a)(2)(H)(i).  But these references alone are not

enough for the Court to infer that Congress intended to create a privately enforceable remedy in

the representative payee provisions.  As the defendants note, the fact that these provisions may be

_____

[24]  In addition, the statutes expressly provide a mechanism by which beneficiaries may obtain judicial review of agency decisions regarding representative payees.  42 U.S.C. §§ 405(j)(2)(E)(i) and 1383(a)(2)(B)(ix).  Under the representative payee provisions, beneficiaries who are not satisfied with an agency determination regarding the selection of their representative payee are entitled to an administrative hearing by the Commissioner of Social Security and judicial review of Commissioner's final decision.  Id.; see also 42 U.S.C. § 405(g) (stating that "[a]ny individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party . . . may obtain a review of such decision by a civil action . . . brought in [a United States] district court").  Thus, the statutes do provide aggrieved beneficiaries an express avenue by which they may challenge, and ultimately appeal to federal court, decisions of the SSA regarding their representative payees, and "the existence of [this] more restrictive private remedy" suggests that Congress did not intend to create a broader private cause of action under the representative payee provisions.  Rancho Palos Verdes, 544 U.S. at 121.

49

"consistent with granting a private remedy . . . is a far cry from [establishing] . . . that they manifest Congress' unambiguous intent to allow a beneficiary to bring such an action."  Defs.' Reply at 15; see Alexander, 532 U.S. at 289 (noting that statute must "manifest an intent to create a private remedy").  Given the express statutory language imposing criminal liability on representative payees who misuse benefits, 42 U.S.C. §§ 408(a)(5) and 1383a(a)(4), and requiring the Commissioner of Social Security to "make a good faith effort to obtain restitution [of misused benefits payments] from the terminated representative payee," id. §§ 405(j)(5) and 1383(a)(2)(E), it is perfectly easy to imagine a means by which "a court of competent jurisdiction" might have the opportunity to determine whether a representative payee had misused the benefits payments of a beneficiary without needing to construe the statutes to permit a beneficiary to sue a representative payee in federal court.

Nor do the relevant regulations demonstrate "that Congress intended to allow a beneficiary who is harmed by a representative payee's misuse of payments to bring an action in any court of competent jurisdiction."  Pls.' Opp. at 26.  Even if the regulations contained clear language suggesting that a beneficiary has a private cause of action against a representative payee, which they do not, see generally 20 C.F.R. §§ 404.2001 et seq. and 416.601 et seq., it is a bedrock principle that "[l]anguage in a regulation may invoke a private right of action that Congress through statutory text created, but it may not create a right that Congress has not." Alexander, 532 U.S. at 291; see also Touche Ross, 442 U.S. at 577 n.18 (stating that "the language of the statute and not the rules must control").  Because the Court concludes that the relevant statutes do not create a private remedy, the language of the implementing regulations

cannot "conjure up a private cause of action that has not been authorized by Congress."
Alexander, 532 U.S. at 291.

When the representative payee provisions are contrasted with other statutes that do
expressly provide a private cause of action, it becomes even more apparent that Congress did not
clearly intend to allow injured beneficiaries to file lawsuits against their representative payees.
For example, the civil remedies provision of RICO straightforwardly and unambiguously states
that "[a]ny person injured in his business or property by reason of a violation of [18 U.S.C. §
1962] may sue therefor in any appropriate United States district court."  18 U.S.C. § 1964(c).
Similarly, the Age Discrimination in Employment Act states that "[a]ny person aggrieved may
bring a civil action in any court of competent jurisdiction for such legal or equitable relief as will
effectuate the purposes of [the Act]."  29 U.S.C. § 626(c)(1) (2000).  And the Family and
Medical Leave Act unequivocally authorizes aggrieved employees to bring "[a]n action to
recover damages or equitable relief . . . against any employer . . . in any Federal or State court of
competent jurisdiction."  29 U.S.C. § 2617(a)(2) (2000).  If Congress had intended to include
equivalent statutory language in the Social Security Act allowing beneficiaries to bring actions
against their representative payees, it could easily have done so.  It did not.[25]  Accordingly, the
Court finds that 42 U.S.C. §§ 405 and 1383 do not create private causes of action, and grants the
defendants' motion to dismiss the plaintiffs' claims brought under these statutes.

---

[25] This is not to say, of course, that aggrieved beneficiaries are left without any remedy against malfeasant
representative payees.  Assuming they have not been made whole by 42 U.S.C. §§ 405(j)(5)(a) and 1383(a)(2)(E) or
42 U.S.C. §§ 405(j)(7)(A) and 1383(a)(2)(H)(i), such beneficiaries may sue their representative payee for
conversion, negligence, or breach of fiduciary duty, as the plaintiffs have done in this case.

### D.  The Plaintiffs' Claim of Money Had and Received

The defendants argue that the plaintiffs' claim of money had and received, which both parties agree is "properly understood as a claim for unjust enrichment," Defs.' Mem. at 29; see Pls.' Opp. at 30, should be dismissed on two grounds.  Defs.' Mem. at 29-30; Defs.' Reply at 23-25.  First, the defendants argue that unjust enrichment is an equitable doctrine under which the plaintiffs cannot seek relief unless they lack an adequate remedy at law.  Defs.' Mem. at 29-30; Defs.' Reply at 24-25.  Second, the defendants contend that the plaintiffs have failed to allege an essential element of their unjust enrichment claim because the complaint does not demonstrate that the benefit the defendants received as a result of the alleged unjust enrichment was conferred by the plaintiffs and not by some third party.  Defs.' Mem. at 30; Defs.' Reply at 23-24.  The Court finds both arguments unpersuasive.

Federal Rule of Civil Procedure 8 clearly states that parties may plead "as many separate claims or defenses as the party has regardless of consistency and whether based on legal, equitable, or maritime grounds."  Fed. R. Civ. P. (8)(e)(2) (emphasis added); see also Scott v. District of Columbia, 101 F.3d 748, 753 (D.C. Cir. 1997) (stating that under Rule 8(e)(2), litigants may "properly plead alternative theories of liability, regardless of whether such theories were consistent with one another") (citation omitted).  While it is true that the plaintiffs would not ultimately be able to recover damages based on mutually exclusive or otherwise contradictory theories of liability, Scott, 101 F.3d at 753 (citation omitted), it is inappropriate, in light of the express language of Rule 8(e)(2), to dismiss such theories at this early stage in the litigation merely because the plaintiff has requested both legal and equitable remedies.  See United States

ex rel. Purcell v. MWI Corp., 254 F. Supp. 2d 69, 79 (D.D.C. 2003) (permitting plaintiff to allege

both unjust enrichment and violations of the False Claims Act under Rule 8(e)(2)) (citing cases).

As for the claim that the plaintiffs have inadequately alleged the elements of unjust

enrichment, the defendants provide no support for their counter-intuitive proposition that a

payment owed to the plaintiffs by the federal government and administered through the

defendants in their capacity as the plaintiffs' fiduciary does not constitute a benefit "conferred

upon the [d]efendant[s] by the [p]laintiff[s]." Defs.' Mem. at 30. As another member of this

Court has recently stated, "[u]njust enrichment occurs when a person retains a benefit (usually

money) which in justice and equity belongs to another." Ellipso, Inc. v. Mann, Civ. No. 05-1186

(RCL), ___ F. Supp. 2d ____, 2006 WL 3114467, at *3 (Nov. 2, 2006) (internal quotation marks

and citation omitted). And, as noted by the District of Columbia Circuit, a plaintiff bringing a

claim for unjust enrichment "must show that (1) he had a reasonable expectation of payment, (2)

the defendant should reasonably have expected to pay, or (3) society's reasonable expectations of

person and property would be defeated by nonpayment." Heller v. Fortis Benefits Ins. Co., 142

F.3d 487, 495 (D.C. Cir. 1998) (internal quotation marks and citation omitted). The plaintiffs

allege, and the defendants do not dispute, that (1) the defendants served as the plaintiffs'

representative payees under the Social Security Act; (2) in that capacity, the defendants received

federal benefits payments intended for the plaintiffs; and (3) the defendants owed a fiduciary duty

to the plaintiffs as a result of their representative payee status. See Compl. ¶¶ 2-3. These

allegations are more than sufficient to sustain a claim of unjust enrichment at the pleading stage.

Accordingly, the Court denies the defendants' motion to dismiss the plaintiffs' claim of money

had and received.

53

*E. The Plaintiffs' Request for an Accounting*

The plaintiffs ask the Court to require "[e]ach of the [d]efendants . . . to account for their receipt, use and possession of all federal benefits and other payments that they at any time possessed or controlled while serving as representative payee, trustee, or [in] any other fiduciary capacity for the [p]laintiffs." Compl. ¶ 109.  The defendants argue that this request for an accounting should be dismissed for two reasons.  First, the defendants contend that, like the plaintiffs' claim for unjust enrichment, accounting is an equitable remedy which cannot be maintained if there exists an adequate remedy at law.  Defs.' Mem. at 28; Defs.' Reply at 23. This argument also fails for the reasons articulated above.  See generally Part III.D, supra. Second, the defendants assert in their reply to the plaintiffs' opposition to the motion to dismiss that the "[p]laintiffs' request for an accounting is premature and burdensome," and that it should not "stand[] on its own as a viable cause of action."  Defs.' Reply at 23.

Courts "highly disfavor[] parties creating new arguments at the reply stage that were not fully briefed during the litigation."  Pub. Citizen Health Research Grp. v. Nat'l Insts. of Health, 209 F. Supp. 2d 37, 43-44 (D.D.C. 2002); see also Wright v. United States, 139 F.3d 551, 553 (7th Cir. 1998) (observing that "a reply brief containing new theories deprives the [adverse party] of an opportunity to [respond]").  Moreover, due to the sparseness of the defendants' arguments in opposition to the plaintiffs' request for an accounting, it is difficult for the Court to glean the precise legal basis on which the defendants are resting their contention that this count of the plaintiffs' complaint should be dismissed for failure to state a claim.  See Defs.' Reply at 23. Nevertheless, the Court is able to conclude that it would be inappropriate to dismiss the plaintiffs' accounting request at this stage of the litigation.

54

An accounting is "a detailed statement of the debits and credits between parties arising out of a contract or a fiduciary relation." Union Nat'l Life Ins. Co. v. Crosby, 870 So.2d 1175, 1178 n.2 (Miss. 2004); see also P.V. Props., Inc. v. Rock Creek Vill. Assocs., 549 A.2d 403, 409 (Md. App. 1988) (stating that "[a]n accounting may be had where one party is under an obligation to pay money to another based upon facts and records which are known and kept exclusively by the party to whom the obligation is owed") (citations omitted).  Such relief may be obtained at the close of a litigation "in actions arising out of a tort where there is an allegation of fraud, especially when there is an additional ground for jurisdiction, such as the existence of a fiduciary relationship," and as long as the plaintiff is able to show "that the remedy at law is inadequate." 1 Am. Jur. 2d Accounts and Accounting § 59 (2006) (citations omitted).  While an accounting is admittedly "an extraordinary remedy," it may nevertheless be appropriate when a plaintiff is unable "to determine how much, if any, money is due him from another." Bradshaw v. Thompson, 454 F.2d 75, 79 (6th Cir. 1972); see Pls.' Opp. at 29 (claiming that "it will likely not be possible for [the] [p]laintiffs to establish what damages are owed by the [d]efendants absent an accounting").  Although it certainly remains to be seen whether the plaintiffs will be entitled to an accounting, the complaint adequately alleges facts supporting the potential need for such a remedy.  See Compl. ¶ 107 (alleging that "[t]he accounts that the [d]efendants have maintained for the [p]laintiffs' payments are complicated, and all records relating to them have been in the [d]efendants' exclusive control, making it impossible for the [p]laintiffs to determine what funds were received, spent, and remain, without discovery and judicial intervention").  Accordingly, the Court denies the defendants' motion to dismiss the plaintiffs' request for an accounting.

*F.   The Plaintiffs' Request for Punitive Damages*

The defendants argue that the "vague allegation[s] . . . [and] conclusory statements" contained in the plaintiffs' complaint do not describe conduct warranting an award of punitive damages.  Defs.' Mem. at 28.  The Court disagrees.  Under District of Columbia law, "[p]unitive damages may be awarded for conduct that is willful and outrageous, exhibits reckless disregard for the rights of others, or is aggravated by evil motive, actual malice, or deliberate violence or oppression."  Cambridge Holdings Gp. v. Fed. Ins. Co., 357 F. Supp. 2d 89, 97 (D.D.C. 2004) (internal quotation marks and citations omitted).  Moreover, the Supreme Court has stated that "the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant[s'] conduct," BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 575 (1996) (footnote omitted), which should be determined using such factors as whether "[1] the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; [2] the target of the conduct had financial vulnerability; [3] the conduct involved repeated actions or was an isolated incident; and [4] the harm was the result of intentional malice, trickery, or deceit, or mere accident."  State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 419 (2003) (citation omitted).

Here, the plaintiffs allege that they are poor, unemployed, and mentally ill individuals who rely on their federal benefits payments "to obtain basic living necessities such as food, clothing and shelter."  Compl. ¶¶ 6-7.  They further allege that the defendants, over a period of several years, conspired to gain "exclusive control over [the] [p]laintiffs' [benefits payments]" by assuming the role of the plaintiffs' government-appointed fiduciaries, id. ¶ 30, and then misappropriated the plaintiffs' funds for their own purposes rather than applying them to the

56

plaintiffs' use and benefit as required by statute, causing the plaintiffs to be "without funds for

housing, medicine and other necessities for substantial periods of time," id. ¶ 36.  Finally, the

plaintiffs allege that the defendants attempted "to conceal their wrongdoing" by failing to keep

proper records of how the plaintiffs' money was being spent, id. ¶ 38, ultimately fleeing the

jurisdiction "without returning or properly accounting for the substantial amounts of [the]

[p]laintiffs' money in their possession, or which had been misspent and was unaccounted for,"

id. ¶ 47.  In sum, the plaintiffs allege that the defendants crafted a scheme to prey upon some of

the most vulnerable members of our society by pretending to act in their interests while secretly

and systematically depriving them of money needed for "basic living necessities such as food,

clothing and shelter."  Id. ¶¶ 6-7; see generally id.  The alleged conduct "evinced an indifference

to . . . the health or safety of others," was directed toward "financial[ly] vulnerab[le]" individuals,

and "involved repeated actions" over the course of years as well as "trickery [and] deceit."

Campbell, 538 U.S. at 419; see generally Compl.  Therefore, taking the plaintiffs' allegations as

true, as this Court is bound to do when considering a Rule 12(b)(6) dismissal motion, Trudeau,

456 F.3d at 193, the Court agrees with the plaintiffs that they have adequately pled conduct

which, if proven, is sufficiently "willful and outrageous" to merit an award of punitive damages.

Cambridge Holdings, 357 F. Supp. 2d at 97; see Pls.' Opp. at 27-28.

## IV.  Conclusion

For the reasons stated above, the Court concludes that (1) the plaintiffs' complaint "omits

certain essential facts," Belizan, 434 F.3d at 583, necessary to state claims under RICO and

Section 1983; (2) the representative payee provisions of 42 U.S.C. §§ 405 and 1383 do not create

privately enforceable remedies; and (3) the plaintiffs have, at this stage in the litigation,

adequately alleged facts to support their claim for money had and received and their requests for

an accounting and for punitive damages.  Accordingly, the Court dismisses the plaintiffs' RICO

and Section 1983 claims without prejudice, dismisses the plaintiffs' claims under 42 U.S.C. §§

405 and 1383 with prejudice, and denies the defendants' motion to dismiss the plaintiffs'

remaining claims.  In addition, the Court grants the plaintiffs leave to amend their complaint to

assert their RICO and Section 1983 claims with greater particularity and in accordance with this

Memorandum Opinion.

SO ORDERED this 11th day of December, 2006.[26]


REGGIE B. WALTON
United States District Judge

---

[26] An Order consistent with the Court's ruling accompanies this Memorandum Opinion.